```
               UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

LYNN GARDNER MOSS              :  No. 3:04CV-1511 (SRU)
                              :  915 Lafayette Boulevard
          vs.                 :  Bridgeport, Connecticut
                              :
                              :  March 1, 2012
WYETH, INC., ET AL            :

- - - - - - - - - - - - - - - - x

                    MOTION HEARING

B E F O R E :

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S :

    FOR THE PLAINTIFF:

          BUBALO ROTMAN PLC
               9300 Shelbyville Road, Suite 215
               Louisville, Kentucky  40222
          BY:  GREGORY BUBALO, ESQ.
               STEVEN B. ROTMAN, ESQ.

          URY & MOSKOW
               883 Black Rock Turnpike
               Fairfield, Connecticut  06825
          BY:  NEAL L. MOSKOW, ESQ.

    FOR THE DEFENDANT:

          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
               1440 New York Avenue, NW
               Washington, DC  20005-2111
          BY:  MICHELE A. ROBERTS, ESQ.
               CATHERINE B. STEVENS, ESQ.  (New York)

          KAYE SCHOLER, LLP
               425 Park Avenue
               New York, New York  10022-3598
          BY:  ADRIENNE D. GONZALEZ, ESQ.

                              (Continued)
```

SNELL & WILMER, LLP
    3883 Howard Hughes Parkway
    Suite 1100
    Las Vegas, Nevada  89169
BY:  KELLY A. EVANS, ESQ.

WIGGIN & DANA
    265 Church Street,
    P. O. Box 1832
    New Haven, Connecticut  06508
BY:  JAMES I. GLASSER, ESQ.
    JOSEPH W. MARTINI, ESQ.  (Stamford, CT)




Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917)703-0761

```
1                    (10:05 O'CLOCK, A. M.)

2               THE COURT:  Good morning.  We're hear in the

3     matter of Moss v. Wyeth.  Could I have appearances,

4     please?

5               MR. BUBALO:  Your Honor, Greg Bubalo for the

6     plaintiff.  My partner, Steve Rotman.

7               MR. ROTMAN:  Good morning.

8               MR. BUBALO:  And we also have Neal Moskow.

9               MR. MOSKOW:  Good morning, Your Honor.

10              MR. GLASSER:  Good morning, Your Honor.  Jim

11    Glasser on behalf of Wyeth.

12              Also present in court, Your Honor, is Michelle

13    Roberts.

14              MS. ROBERTS:  Good morning, Your Honor.

15              MR. GLASSER:  Catherine Stevens.

16              MS. STEVENS:  Good morning, Your Honor.

17              MR. GLASSER:  Adrienne Gonzalez.

18              MS. GONZALEZ:  Good morning, Your Honor.

19              MR. GLASSER:  And Neal Kelly.

20              THE COURT:  All right.

21              MR. ROTMAN:  Actually people are confusing my

22    name.  My name is Kelly Evans, Your Honor.

23              MR. GLASSER:  Pardon me.

24              THE COURT:  Thank you.  We've got it.

25              All right.  We're here for argument on the
```

| | |
|---|---|
| 1 | Daubert motions as well as the motions for summary |
| 2 | judgment.  And let me tell you that, as is my usual |
| 3 | practice, it's my hope to issue oral rulings today on each |
| 4 | of those motions.  There may be a reason that I have to |
| 5 | write on one or more of these motions, but you should |
| 6 | assume that I'm going to try and do this orally today. |
| 7 | And that means each of you needs to be vigilant so that if |
| 8 | you don't understand the basis for my ruling, and wish to, |
| 9 | that you ask me today to clarify, which I will be happy to |
| 10 | try and do. |
| 11 | MS. ROBERTS:  Good morning, Your Honor.  Michele |
| 12 | Roberts on behalf of Wyeth.  Your Honor, we'll proceed in |
| 13 | whatever fashion you want.  By way of an offer, we would |
| 14 | propose that we would -- the court would hear brief |
| 15 | argument on summary judgment motions and then we could |
| 16 | address some of the Daubert motions, if that's the court's |
| 17 | pleasure.  If you have another way of proceeding, we'll do |
| 18 | whatever you want. |
| 19 | THE COURT:  Well, I was going to go in the other |
| 20 | order. |
| 21 | MS. ROBERTS:  Okay.  You're the judge. |
| 22 | THE COURT:  Because I think summary judgment |
| 23 | depends, at least in part, whether there's expert |
| 24 | testimony on certain issues, but -- |
| 25 | MS. ROBERTS:  Okay. |

```
 1                    THE COURT:  I'm not stuck in that.  Is there
 2        some reason to take summary judgment up first?
 3                    MS. ROBERTS:  No, it's just the way we planned
 4        it, but we'll do whatever the court pleases.
 5                    THE COURT:  All right.
 6                    MS. ROBERTS:  We'll start with causation.
 7                    THE COURT:  Well, here's kind of what I was
 8        thinking.
 9                    MS. ROBERTS:  Okay.
10                    THE COURT:  You tell me if this is going to work
11        for you.
12                    MS. ROBERTS:  Your Honor, whatever you want,
13        we're going to do, so --
14                    THE COURT:  I have each of these motions kind of
15        lined up.
16                    MS. ROBERTS:  Okay.
17                    THE COURT:  And I was going to take them up one
18        by one, expert by expert, give you a sense of how I'm
19        going and then that will help you focus your arguments
20        with respect to that expert on whatever aspect of my
21        intended ruling you think might be mistaken.
22                    MS. ROBERTS:  That's perfect.
23                    THE COURT:  Does that work?
24                    MS. ROBERTS:  Absolutely.
25                    THE COURT:  Okay.
```

1          MS. ROBERTS:  Whatever you want.

2          THE COURT:  Let's give it a shot.  We'll see how

3     it goes.

4          Let me just start by noting the standard that

5     governs Daubert motions.  Rule 702 of the Federal Rules of

6     Evidence addresses testimony to be provided by experts and

7     establishes a standard of evidence reliability.  It

8     requires a valid connection to the pertinent inquiry as a

9     precondition to admissibility.

10         In short, what Daubert requires me to do is

11    determine whether an expert's testimony is both reliable

12    and relevant.  Most of the challenges today go to

13    reliability and will focus principally on that.  There are

14    some that turn on relevance.

15         And the Supreme Court has set out a list of

16    nonexclusive factors that I should consider when deciding

17    whether the reasoning or methodology of a particular

18    expert is reliable.  That includes the theory, whether the

19    theory or technique has been tested, whether it's been

20    subjected to peer review, to publication, whether there's

21    a known or potential rate of error in the technique, the

22    existence of standards controlling the technique's

23    operation, and whether the method has been generally

24    accepted by the appropriate professional community.

25         I'm not going to set forth the background of

1    this case except to the extent necessary with respect to a

2    particular ruling.  It's obviously been set out at some

3    length in the papers and I know all of you are quite

4    familiar with it.  If you think that it's necessary for me

5    to get into greater detail about the record than I do,

6    obviously that's something you can request.

7         All right.  I'm taking these really in the order

8    in which they were filed.  The first is the motion to

9    exclude the expert opinions of Dr. Roger Graham, which is

10   Motion Number 74.  The motion is predicated really on

11   three grounds:  That Mr. Graham's causation opinions are

12   outside his field of expertise, that his opinions are

13   based on unreliable methodology that's known as

14   "differential diagnosis," and that he failed reliably to

15   apply his methodology to the facts of this case.

16        It's my current intention to deny the motion to

17   exclude Graham's testimony.  I believe that he has

18   sufficient training and experience to give an opinion;

19   notwithstanding the need to touch upon areas other than

20   those in which he has his formal degrees.  I believe a

21   differential diagnosis is a recognized methodology that

22   has been widely applied by Graham to the facts of this

23   case.  So that's my current thinking.

24        MR. EVANS:  So I have a little bit of an uphill

25   battle, Your Honor.

1          THE COURT:  You have an uphill battle but I have

2     an open mind, so you are to be encouraged by that.

3          MR. EVANS:  Well, again, Your Honor, I'm Kelly

4     Evans on behalf of Wyeth.

5          I think I'd like to just cut right to the chase,

6     which is, putting aside the differential diagnosis, and

7     obviously our briefs have said that's not a valid

8     methodology to use in this case, application of a

9     differential diagnosis is a whole other issue, and if you

10    look at the facts of this case, at its core, what Drs.

11    Graham and Dr. Cronin are doing is saying that I can look

12    at an individual woman and I can say, because of her

13    menopausal symptoms, that she is, quote, "estrogen

14    deficient."  She then has, according to them, an estrogen

15    dependent tumor, and they say an ER positive tumor is

16    estrogen dependent, and, again, our papers say that that

17    is an invalid assumption, but take that for what it is.

18          And then they say, therefore, the only source

19    that this tumor had in order to develop and grow and

20    whatever was the exogenous hormone therapy, the pills that

21    she was taking.

22          THE COURT:  Well, it doesn't have to be "only;"

23    it has to be --

24          MR. EVANS:  A substantial.

25          THE COURT:  Right.

1          MR. EVANS:  Right.  The problem I have with that

2     is Dr. Graham doesn't have any methodology that's peer

3     reviewed, that's subject to testing, the issues that you

4     identified, to say how much estrogen that tumor that

5     Mrs. Moss had required to develop and grow.  That's point

6     number one.

7          Point number two, there's no methodology for

8     Dr. Graham to say, gee, in her case she did not have

9     sufficient endogenous estrogen available at the tumor site

10    and that -- in the breast, of course, you have different

11    levels of estrogen and circulating estrogen.  You have

12    fatty tissue that generates its own estrogen.  The tumor

13    itself can generate its own estrogen.  But Dr. Graham

14    acknowledges that just because she has menopausal symptoms

15    doesn't mean that she doesn't have any of her own

16    estrogen.

17         So the question, and the real issue here, how

18    does he say I don't know how much estrogen the tumor

19    required and I don't know how much estrogen she had

20    endogenously, how do you say that, therefore, the

21    endogenous estrogen was a substantial factor?

22         THE COURT:  You're going to have a great cross.

23         MR. EVANS:  I will, but --

24         THE COURT:  But that's the difference, I think.

25    In Daubert I'm not saying the expert is correct, I'm not

1    saying the expert is certain.  I'm saying, is the expert

2    sufficiently reliable to permit that expert to testify to

3    allow a jury to resolve doubts about the ultimate merits.

4            MR. EVANS:  I understand, Your Honor.  And our

5    position is that determination of how much estrogen does a

6    tumor need, how much did she have, was it sufficient for

7    what the tumor needed, that's not subject to peer review.

8    That's not subject to testing.  There's no methodology.

9    What's the failure rate?  It's completely off the cuff and

10   that's not --

11           THE COURT:  Well, okay --

12           MR. EVANS:  With due respect, that's not a cross

13   examination question.

14           THE COURT:  Well, okay, but here we go.  If

15   there's a fire and somebody throws gasoline on the fire,

16   the expert doesn't have to say, to be admissible under

17   Daubert, the quantity of gasoline, the heat of the fire,

18   it's a combination of circumstances that, that the expert

19   can say, guess what, there was combustion as a result of

20   this combination of circumstances.  And what you're trying

21   to do is force the expert into such a specific detailed

22   opinion that you can argue lack of reliability.

23           What I'm suggesting is the expert can be

24   permitted to testify on a broader scale.  You know,

25   substantial cause is relatively broad, and to the extent

1   the expert can reliably say this is a realistically

2   validly determined potential cause, then ultimately the

3   jury gets to decide whether that potential or contributing

4   or, you know, otherwise present cause was substantial or

5   not.

6         And, you know, one of the problems that kind of

7   runs through the papers here, my sense is that Wyeth is

8   looking for certainty as a limiting principle under the

9   Daubert motions and, you know, if experts could be

10  certain, we wouldn't have trials.  We wouldn't need

11  trials.  And, really, what it comes down to is you're

12  going to have your experts, they are going to have their

13  experts, and the ultimate question is do both sets of

14  experts get to testify or not.  And I guess I'm just, I'm

15  struggling to understand why Graham or Cronin or some of

16  the others haven't done a good enough job to be able to

17  get up on the witness stand to be subject to your cross

18  examination.

19         MR. EVANS:  And I'll go back to your fire

20  analogy.  If the fireman, the fire investigator shows up

21  and the car is fully inflamed and then the question is,

22  well, did this guy who came by and threw a gallon of

23  gasoline on the fire somehow change it, did he do anything

24  more than what was already happening?  It seems to me

25  there has to be some way of differentiating and

1   identifying what was going on.  You can't just say, oh,

2   there's a fire and anyone that had anything to do with it

3   was, is equally culpable or substantially culpable, which

4   is what they are saying.

5           And so I guess, you know, our position is, and

6   we've certainly put this in the paper, but you have to be

7   able to, when you're applying a differential diagnosis,

8   you have to be able to look at it and say, okay, we're

9   going to exclude causes and one of the causes that they

10  have to exclude is endogenous estrogen.  And I --

11          THE COURT:  But they don't have to completely

12  exclude it.  That's what I'm trying to get at with the

13  substantial cause standard.  In other words, that's a

14  potential contributing cause.  The drug is a potential

15  contributing cause.  And maybe her age or alcohol use are

16  potential contributing causes, and the point is can an

17  expert testify that the drug is a contributing cause such

18  that a jury could find that it's a substantial cause.

19          MR. EVANS:  Well, Your Honor, then I think we're

20  right back to what differential diagnosis is.  If you're

21  just identifying possible causes and not doing anything to

22  exclude them, then you're just simply saying here's a

23  whole list of things, they are all substantial or

24  depending on which one I'm looking at.

25          THE COURT:  Right, but he has excluded.  He's

1    gone through the process.  You may disagree with the

2    outcome of the process.

3              MR. EVANS:  Sure.

4              THE COURT:  But he's gone through the process

5    and he's said, you know what, by ruling in these potential

6    causes and ruling out those potential causes, it's my

7    professional opinion that the drug use was a substantial

8    contributing cause.  In fact, he probably -- probably the

9    principal cause would be his opinion, I assume.  But --

10             MR. EVANS:  And, Your Honor, I, not having

11   argued in front of you before, I don't know whether I

12   should shut up and sit down or, you know, how far I should

13   push this so I'll just take one more crack at it.

14             THE COURT:  Yes, sure.

15             MR. EVANS:  Which is what you just said, that is

16   the part that doesn't have any reliable methodology

17   attached to it.  There is no peer reviewed article.  There

18   is no testing.  There is nothing that traditionally

19   Daubert examination looks at to say that this expert can

20   do what you just described him doing.

21             THE COURT:  Yes, that's a general attack on

22   differential diagnosis which, you know, frankly I don't

23   buy.  That's what doctors do all the time.  A doctor may

24   not be certain about even what disease you have, much less

25   what caused it, but this is what they do and this is how

1    they do it, day in and day out.

2         MR. EVANS:  Well, they don't do that in this

3    context though, Your Honor, and that's the difference and

4    that's where our papers have tried to establish, this

5    concept that you can take an individual woman --

6    differential diagnosis traditionally is, oh, you've got a

7    lump on your breast, let's figure out what that is.  You

8    don't take the next step in the breast cancer context of

9    saying, okay, I'm now going to look at your tumor and I'm

10   going to look at you as a patient and I'm going to

11   determine what was the cause of your tumor.

12        And that's, I mean I think Dr. Graham himself

13   admitted that he doesn't do that in practice.  That's not

14   something they do day in and day out.  So I understand

15   generally differential diagnosis happens everyday, sure,

16   but in this context, I think that's where you have to

17   look.

18        THE COURT:  Yes, I understand the argument.  You

19   know, it has, it's not completely meritless, don't get me

20   wrong, but I just think the better rule here is -- or the

21   better ruling on these motions is that it comes in and you

22   cross them because -- you know, take a more common

23   example.  You know, a 20 year smoker who's overweight and

24   has certain other risk profiles, risk characteristics that

25   might lead to lung cancer, you know, and the doctor's

treating that person and the doctor says, well, I'm pretty
sure you've got lung cancer, I looked at the x-ray.  Now
let's figure out what might have caused that.  Is it
really a jump to say, well, I'm going to rule out this,
that and the other thing and focus here on the smoking?
And smoking may not in fact actually have caused your lung
cancer but, you know, it seems much more probable than any
other possible cause.  And that's I think what's happening
here, which I think is legitimate.

MR. EVANS:  Yes, and, Your Honor, of course the
difference between smoking and lung cancer, two-fold, one
is the level of risk is orders of magnitude greater, so if
you were to look at 20 people who were smoking and got
lung cancer, some studies would suggest that 19 of those
you could attribute to the smoking.  There isn't anything
similar to that with respect to hormone therapy and breast
cancer.

And the fact that WHI, as we pointed Your Honor
to, talks about there are 30 patients in the background
population of ten thousand women who get breast cancer and
there are 38 in the treatment room, so you have eight
additional cases, but how do you differentiate which of
the 38 were, the eight that got it, you know, arguably
attributable to, versus the 30 who didn't.  So that's one
difference.

1              And the other difference, I think, is -- and I'm

2      not Mr. Smoking and Lung Cancer Attorney so I don't

3      know -- but I believe that you can also pathologically

4      look at a tumor and tell it's different than something

5      that's not associated with smoking.

6              THE COURT:  Well, that's true.

7              MR. EVANS:  And you can't do that here.  Here

8      you've got an ER positive tumor but 70 percent of all

9      tumors, whether a woman uses hormone therapy or not, are

10     ER positive.  So you have a woman who has the same risk

11     factors, has the same menopausal symptoms, doesn't take

12     hormonal therapy, she can still get exactly the same tumor

13     that Ms. Moss got.  And so that's our problem and

14     difference.

15             THE COURT:  No, I understand.  I think that

16     ultimately it's a burden of proof issue and it's a cross

17     examination issue.  I think, you know, I think you're

18     trying to use Daubert just a little too aggressively.  I

19     think it's -- Daubert is a gatekeeping kind of standard.

20     You know, is this junk science.  I just don't think it's

21     junk science.

22             MR. EVANS:  And I will, Your Honor, just to the

23     point of not ruling out other causes, you know, the MDL

24     judge, Judge Wilson, looked at this very issue with

25     respect to Dr. Back (ph) and concluded that because he

```
 1    didn't apply the differential diagnosis, because he didn't

 2    eliminate other potential causes, that he was going to

 3    exclude Dr. Back, so I think that's a much more similar

 4    situation to what we have here.

 5             With that, I'll sit down, Your Honor.  I

 6    appreciate it.

 7             THE COURT:  All right.  Thank you.

 8             MR. ROTMAN:  Your Honor, I'm prepared to argue

 9    if the court has any questions but I'm feeling like

10    there's no need to argue based on what I just heard.

11             THE COURT:  Frankly I don't need argument from

12    you and I'm happy to proceed.

13             Let me just ask Mr. Evans, are you handling

14    Cronin as well?  It seems to me the two of them go hand in

15    hand and if I'm missing something, if there's some

16    distinction with Cronin from Graham, let me know.  I think

17    there are slight differences but fundamentally it seems to

18    me that your attacks on both of them are very similar.

19             MR. EVANS:  I agree, Your Honor, they are very

20    similar.  I think the one additional fact that Dr. Cronin

21    admitted in his deposition was he acknowledged there were

22    other growth factors that he -- that are potentially

23    present and, again, he didn't have a way of ruling them

24    out.  I think that we quoted that language to you from his

25    deposition so I think that specific case -- so you not
```

1    only have endogenous estrogen but you have these

2    completely separate growth factors that can be playing a

3    role and he, again, doesn't have any way of saying it's

4    not only the estrogen pathway and it's the estrogen from

5    hormone therapy, but he can't rule out these additional

6    pathways as well.

7            THE COURT:  All right.  Okay, well, I'm going to

8    deny the motions to exclude the testimony of Graham and

9    Cronin substantially for the reasons that I've indicated

10   initially and perhaps slightly amplified during colloquy.

11           I'm prepared to cite cases and give more detail

12   if Wyeth would like me to do that at this time.  It's

13   really up to you.  I don't know the extent to which you

14   want me to lay out on the record cases I'm relying on,

15   that type of thing.

16           MR. EVANS:  With respect, Your Honor, I think we

17   would like the court to put his reasoning on the record.

18           THE COURT:  All right, I can do that.

19           Dr. Roger Graham is a surgical oncologist.

20   He's, as I said, been attacked under Daubert on three

21   grounds.  I believe none of those grounds satisfy the

22   standard for excluding his testimony under the Daubert

23   approach.

24           First, whether his opinions are outside his

25   field of expertise, I believe he's, as a breast cancer

 1   surgeon, qualified to testify regarding the treatment and

 2   the cause of breast cancer in breast cancer patients.

 3          Although he's not a cell biologist or

 4   epidemiologist, he can reliably interpret epidemiological

 5   data and describe the relationship between menopausal

 6   symptoms, estrogen and increased breast cancer risk.

 7          I would note that he's well qualified.  He had a

 8   medical degree from John Hopkins.  He became the Director

 9   of Tufts Medical Breast Health Center in Boston and he

10   serves there as an Associate Professor.  His practice

11   includes the diagnosis and treatment of breast cancer and

12   he's authored articles and lectured on the topic.

13          His causation opinions are based in part on peer

14   reviewed, epidemiological literature, his medical

15   training, academic experience, all of which qualify him to

16   interpret and apply the methodology that he's used.

17          I also believe that the differential diagnosis

18   approach is a reliable methodology within the meaning of

19   Daubert.  I previously held that to be the case in the

20   Perkins v. Origin Medsystems decision where I called it "a

21   standard scientific technique of identifying the cause of

22   a medical problem."  I adhere to that view in this case.

23          Differential diagnosis is not an inherently

24   unreliable methodology simply because it cannot pinpoint

25   the exact cause or initiation of the plaintiff's breast

1    cancer.  Here, the issue is not necessarily the initiation

2    of the cancer but also the promotion of its growth, and it

3    seems to me the differential diagnosis can assist the jury

4    in understanding that theory.

5         The differential diagnosis essentially uses a

6    process of identification of likely causes and elimination

7    of less likely causes to end up with the most likely cause

8    of a particular condition.  The process has also been

9    referred to as "differential etiology" and it's been

10   recognized by the 2nd Circuit Court of Appeals in, for

11   example, McCullock v. H.B. Fuller Company, 61 F.3d 1038,

12   which is a 1995 decision.

13        The Ruggiero v. Warner-Lambert case, relied upon

14   heavily by Wyeth, it seems to me is distinguishable here.

15   That case involved and excluded a general causation

16   opinion, not a specific causation opinion.  And general

17   causation involves a broader question, whether the

18   defendant's product is capable of causing the type of

19   injury at issue in the general population.  Specific

20   causation, which is at issue here, looks at the narrower

21   issue of whether the defendant's product actually caused

22   plaintiff's or contributed to plaintiff's injury or

23   disease.

24        General causation is typically established by

25   medical or epidemiological studies showing a correlation

between a product and disease.  Once the product is shown

incapable of causing a disease, then a patient specific

analysis such as differential diagnosis is used to

determine whether the product actually caused the

plaintiff's illness.

Thus, causation is typically determined in two

stages.  One is epidemiology provides a list of possible

causes for the disease at issue, and then differential

diagnosis eliminates unlikely causes from that list to

determine the most likely cause of plaintiff's disease.

That methodology has been described in various

cases, including In re: Rezulin, R-E-Z-U-L-I-N, Products

Liability Litigation, and Hall v. Baxter Heathcare Corp.

The District Court in Ruggiero excluded the

testimony of general causation because there were no

epidemiological studies in the literature linking rezulin

to cirrhosis, and therefore, this was not a proper

identification of possible causes, as is required in the

first step of differential diagnosis.  That problem does

not occur in this case because there is sufficient

epidemiology to suggest a link between the product at

issue here and general causation.

The 2nd Circuit in Ruggiero held, in effect,

that differential diagnosis "does not necessarily support

an opinion on general causation because, like any process

1   of elimination, it assumes that the final suspected cause

2   remaining after this process of elimination must actually

3   be capable of causing the injury.  Where an expert employs

4   differential diagnosis to rule out other potential causes

5   for the injury at issue, he must also rule in the

6   suspected cause, and do so using scientifically valid

7   methodology."  That's a quote from Ruggiero.

8           Again, here, that is not an issue because we

9   have sufficient epidemiology to establish the first step

10  or permit the first step to be undertaken by the expert.

11          So, Ruggiero really is a fairly narrow holding

12  that in the absence of epidemiological studies linking an

13  agent to a disease, an expert relying solely on

14  differential diagnosis to establish causation must be more

15  rigorous in the clinical process of elimination to ensure

16  the defendant's product is capable of causing the

17  plaintiff's disease in the first place.  So we don't

18  really have that problem here, as I've noted.

19          I would also suggest that, although acknowledged

20  here in argument today, I think in the briefing Wyeth did

21  not seem to appreciate that under Connecticut law that the

22  defendant's conduct is, needs to be or can be a

23  substantial cause rather than the sole cause, so that the

24  plaintiff's burden in Connecticut is to prove by a

25  preponderance that the unsafe product was a substantial

1      factor in causing the injury.  That, I think, is a

2      proposition set forth in Barry v. Quality Steel Products,

3      263 Conn. 424.

4              So, it doesn't matter that these experts, Graham

5      and Cronin, or even medical science today, is not able to

6      pinpoint the precise initiation, the cause or initiation

7      of the plaintiff's cancer.  What matters is whether there

8      is a reliable basis for the expert to testify that the use

9      of the product was a substantial factor in promoting the

10     growth of Moss's cancer cells to detectable and dangerous

11     and ultimately harmful and deadly levels.

12             In sum, I believe under the circumstances of

13     this case, the differential diagnosis as applied by both

14     Graham and Cronin is a reliable basis for their opinions

15     that the Wyeth products at issue were a substantial cause

16     of the plaintiff's injury.

17             Finally, I believe that both Graham and Cronin

18     have reasonably applied the differential diagnosis

19     methodology to the facts of this case.  This turns on the

20     question of whether, I think principally on the question

21     of whether these experts have properly ruled out various

22     potential contributing causes to the plaintiff's injury.

23     And it seems that Wyeth is contending principally that

24     Graham cannot reliably establish Moss's breast cancer and

25     required estrogen growth at the time she took hormone

therapy drugs, that Graham cannot show that Moss's use of those drugs preceded her breast cancer.  And I think that those arguments fail here.

The opinion that Moss's breast cancer required estrogen to grow is grounded in the expert's review of the medical records as well as epidemiological data and studies, including the 2002 WHI study.  The medical records demonstrate Moss was estrogen deficient, as evidenced by a 1991 pap smear and menopausal symptoms.  And those same records revealed after she was diagnosed with breast cancer in 1999, she was found to be estrogen receptor positive and progesterone receptor positive.  Graham was, therefore, able to rule in HT, hormone therapy, as a source of estrogen fuel for the growth of her ER positive tumors and a substantial cause or promoter of Moss's breast cancer.

To the extent that the argument is that Graham failed to properly rule out other potential causes, I would note first off that some of the causes, so called causes that Wyeth points to in this argument are not causes so much as they are risk factors.  That is, age and gender.  The difference between a risk factor and cause I think is well known but I don't think anybody would suggest that Moss's breast cancer was caused because she was a woman, nor was it caused simply because of the

passage of time, that is, her age.  Rather, the risk of breast cancer grows with age and is obviously higher in women than in men.

But the other potential causes, weight, natural production of estrogen and so forth, I think were sufficiently ruled out by both Graham and Cronin to permit them to testify as to their conclusions in applying the differential diagnosis theory.

The experts did, in fact, address age, family history, alcohol use and natural estrogen production and concluded these factors placed Moss at a relatively low level of risk for breast cancer.  People can disagree about that and obviously that's going to be the subject of, no doubt, an intense cross examination.  But the fact that there can be an intense cross examination is not the same as excluding the testimony entirely under Daubert.

In short, the complaints that Wyeth makes about the approach taken by Graham and Cronin in ruling out these other potential causes for breast cancer go to the weight and not the admissibility of the expert's opinion. For that proposition I would cite the McCullock decision at 61 F3d at 1044.

So, in short -- and I think the analysis is almost virtually the same for Graham, Cronin.  I do acknowledge with respect to Cronin there are the other

1    factors regarding potential growth paths, that may be a

2    slightly stronger argument with respect to Cronin, but

3    again, that goes to the scope and the effectiveness of

4    cross examination rather than to the admissibility of

5    either expert's testimony.

6            That's essentially the basis for my ruling with

7    respect to Graham and Cronin.  Any questions or concerns

8    about that?

9            MR. EVANS:  We have lots of questions and

10   concerns but we understand Your Honor's ruling.

11           THE COURT:  That's what I meant.  You

12   understand.  That's the point.

13           MR. EVANS:  Yes.

14           THE COURT:  I'm not asking you to agree with me.

15           MR. EVANS:  What's next, Your Honor?

16           THE COURT:  The next one I have, I'm just going

17   in order here, I have the treating physicians.

18           And let me just try and cut through this because

19   I don't understand there to be necessarily a significant

20   difference of opinion here.  The motion, as I understand

21   it, simply or principally seeks to prevent the treating

22   physicians that have been identified as experts, restrict

23   their testimony from including any undisclosed opinions at

24   trial.  Is that --

25           MS. GONZALEZ:  Yes, Your Honor.  I think you're

```
 1    referring to the "to prevent plaintiff's treating

 2    physicians from providing undisclosed expert testimony."

 3              THE COURT:  Yes.

 4              MS. GONZALEZ:  Yes, okay.

 5              THE COURT:  This is Motion Number 100.

 6              MS. GONZALEZ:  Yes.

 7              THE COURT:  And I don't understand there to be

 8    any real opposition to that motion.  Am I wrong?

 9              MR. ROTMAN:  Correct, Your Honor.  The only

10    issue that I foresee could come up at trial would be how

11    one interprets, how strictly one interprets that

12    restriction.

13              So, for example, if, if a witness who appears

14    live at trial testifies on an issue that was covered in

15    his deposition but the issue at trial is explained in some

16    way that goes off the reservation, you know, a little bit,

17    just so that because maybe the deposition question and

18    answer weren't crystal clear --

19              THE COURT:  Well, you're describing --

20              MR. ROTMAN:  -- with that leeway, we do not

21    disagree -- okay.

22              THE COURT:  You're describing a problem inherent

23    in trials, and Wyeth is going to have the opportunity at

24    trial to object and to say, you know, the witness is now

25    testifying on a matter beyond the scope of the disclosure,
```

1    and if that happens we'll take it up in light of the

2    actual question and what it is the witness wants to say

3    and what they said at the deposition and what they

4    disclose in their expert report, and we'll make a ruling.

5    No one's going to be precluded from that.

6           MS. GONZALEZ:  I think that's exactly right,

7    Your Honor.  And I think your conclusion that there's

8    really nothing in dispute on this particular motion is

9    exactly right.

10          THE COURT:  All right, good.  So I'm going to

11   grant the motion to the extent that it seeks to preclude

12   experts from testifying beyond the scope of their

13   designation and/or their deposition testimony.  That, I

14   understand, is not an especially meaningful ruling because

15   it begs the question in any particular situation whether

16   that has happened or not, but everybody will be left to

17   make the arguments that they want to make at that time --

18          MS. GONZALEZ:  That's fine.

19          THE COURT:  -- in context.  I don't think I can

20   do more than that right now.

21          MS. GONZALEZ:  Yes.

22          THE COURT:  All right.  So 100 is essentially

23   granted, if you will, without prejudice.  See what happens

24   at trial.

25          Okay.  The next one I have is Maloney, which is

1    Motion Number 101.  It's my current intention to grant the

2    motion to exclude Maloney's testimony in its entirety

3    essentially for the following reasons:

4         Under the Connecticut Product Liability Act, the

5    role of the jury is to decide whether punitive damages

6    should be awarded, and the role of the court is to decide

7    the amount of punitive damages to be awarded.

8         I've held in another case recently, and I'm sure

9    the 2nd Circuit and most likely the Connecticut Supreme

10   Court by way of certification are going to decide if I was

11   right or not, but I've held that under the statute, the

12   common law nature of punitive damages, meaning attorney's

13   fees and costs, is the proper measure of punitive damages

14   under the Connecticut Product Liability Statute.

15        Accordingly, we don't need Maloney to testify to

16   the jury, even if I'm corrected by another court, what is

17   the appropriate measure of damages.  That's a decision to

18   be made, that is, the amount is a decision to be made by

19   the court and, therefore, Maloney at best could testify to

20   the court in a post trial proceeding.  So it doesn't

21   appear to me to be appropriate to allow Maloney to testify

22   to the jury.  So let me hear if anybody disagrees with

23   that.

24        MS. GONZALEZ:  Your Honor, obviously defense

25   does not disagree with that.  I also note, as we mention

1    in our reply, as an FYI to the court, if the court were to

2    determine that net worth information is appropriate for

3    consideration, in virtually every trial and trial set case

4    that we've had in the past going on over four years now,

5    the parties have been able to reach a stipulation on that

6    number to provide that information to the court without

7    the need for expert testimony.

8            THE COURT:  Okay.  Thank you.

9            MR. BUBALO:  Your Honor, may I approach?

10           THE COURT:  Sure.

11           MR. BUBALO:  Just a couple of clarifications.

12   First of all, let me -- I always like to agree with the

13   court first of all and so let me tell you how I might

14   agree with you.  I agree that on net worth that in

15   Connecticut, Maloney's testimony doesn't make sense and in

16   that regard, then there's one issue that we step onto, and

17   that issue is the margin of profit in the Premarin family

18   of products.

19           Now, it's my understanding, and I'm sure counsel

20   will correct me if I'm wrong, that we've stipulated in

21   this case that Wyeth had the financial ability to do a WHI

22   study.

23           THE COURT:  Right.

24           MR. BUBALO:  And because they have stipulated to

25   that, that also blocks off another point -- and I really

1  think Maloney's ruling here is more -- not so much

2  Daubert, maybe this is a fine legal technicality, but it's

3  whether his testimony would be relevant, and so that is

4  part of Daubert.

5          THE COURT:  It's the second part of Daubert.

6          MR. BUBALO:  Yes, and so net worth, I agree, not

7  relevant.  Margin's not relevant, as long as they

8  stipulate that the WHI could be done, they have the

9  financial wherewithal to do it.

10          But then we have a third aspect of Maloney's --

11  well, a third aspect of Maloney' testimony, we have also

12  disclosed him as to case specific damages and loss of

13  earnings, and I'm not sure whether your ruling

14  contemplated that or included that but he's simply going

15  to come in and say if, you know, Mrs. Moss had lived her

16  natural lifetime, she would have made so much as a nurse

17  over her natural lifetime.

18          THE COURT:  Well, I didn't address that because

19  I didn't understand Wyeth to be attacking Maloney with

20  respect to that issue.  Maybe I'm wrong.

21          MS. GONZALEZ:  No, the motion went to his

22  testimony about Wyeth, but obviously if he is being

23  offered to speak to economic issues, that is another issue

24  that, quite frankly, in prior cases the parties have been

25  able to reach a stipulation if there is a loss of

1    economics that is being asserted in the case.

2         So it may be fruitful for us to discuss and

3    determine whether this, in fact, is something we still

4    need the court to resolve if we cannot reach agreement,

5    but --

6         THE COURT:  Well, okay.  But Wyeth is not taking

7    the position, is it, that Maloney should be excluded under

8    Daubert or otherwise from testifying about economic loss

9    of the plaintiff for purposes --

10        MS. GONZALEZ:  Not necessarily under Daubert,

11   Your Honor.

12        THE COURT:  Okay.

13        MR. BUBALO:  Okay.

14        THE COURT:  You may make an argument in the

15   future that it would be unnecessary or cumulative or

16   whatever to have him testify in light of the stipulations

17   you have reached.

18        MS. GONZALEZ:  Correct, correct.

19        THE COURT:  All right.  We'll deal with that in

20   the future but I'm not -- nothing in my ruling is intended

21   to prevent the testimony regarding economic damages of the

22   plaintiff in this case because I didn't understand the

23   motion to be addressed to that aspect of the --

24        MS. GONZALEZ:  That is correct, Your Honor.

25        MR. BUBALO:  I didn't either but I wanted to

```
1    make that explicit because I'm a lawyer and I'm

2    obsessive-compulsive.

3            THE COURT:  Fair enough.

4            MR. BUBALO:  And then the next issue, where I do

5    kind of disagree with the court -- understand why you

6    would view it this way but I do disagree -- Dr. Maloney's

7    testimony goes to the motivation and also goes to notice.

8    He is a summary witness.  He comes in and he summarizes

9    two things; number one, gross sales and, number two, net

10   margins.  And I agree that that's different than net

11   profit or net worth, which we would not submit.

12           But on those two things, the gross sales and net

13   margins, in 1975 you see that Premarin sales were up here,

14   were through the roof because of the belief that it makes

15   you younger, it's a fountain of youth, the elixir of

16   youth, what have you.  And, wham, the cancer wall hits the

17   sales, the sales go like this (indicating) and we see that

18   cancer of the uterus goes like this (indicating).

19           So, the next problem is that, when you get to

20   2002, sales are now up here again (indicating) because of

21   people thinking taking projestin will protect the uterus.

22   The WHI occurs and, wham, sales go like this (indicating),

23   and guess what?  Breast cancer in the United States for

24   the first time in decades declines.

25           So I think Dr. Maloney is relevant to show that
```

1    the very financial fabric of this corporation in one of

2    its most important products gave that corporation notice

3    from top to bottom what happens when it hits the cancer

4    wall, and when sales of that product it's so dependent on

5    decreased.  I think that's very relevant.

6              THE COURT:  Relevant to what?

7              MR. BUBALO:  Relevant to notice, Your Honor,

8    and --

9              THE COURT:  How does notice come in here?

10   Notice of what, first off.

11             MR. BUBALO:  Okay.  Notice of what happens when

12   its product is associated with cancer.

13             THE COURT:  Okay, but what does that have to do

14   with Mrs. Moss and her claims?

15             MR. BUBALO:  Well, we're saying that Wyeth

16   didn't take the added measures that needed to happen,

17   didn't do the testing, didn't do the revisions of its

18   labeling, used affirmative marketing to distance itself

19   from cancer because of the first incident of uterine

20   cancer.  What is its motivation for that?  Well, we have

21   some very plain motivation for why it failed to take those

22   measures, the motivation it saw in Trumps (ph) in 1975

23   when it hit the first cancer wall and sales went down.

24             THE COURT:  Your issue is did they do the

25   testing they needed to do.

1          MR. BUBALO:  Yes.

2          THE COURT:  They either did it or they didn't do

3     it.  Motivation strikes me as flavor evidence.  You're

4     trying to paint Wyeth as a bad company and people who are,

5     you know, money grubbing and don't care about plaintiffs,

6     don't care about their consumers.

7          I mean that, you're kind of pushing into 403

8     ground, I think.  It's really not clear to me if you can

9     prove that they didn't do the testing, why it matters or

10    why it's relevant or why it isn't on the other side of 403

11    that they didn't do the testing because they are greedy

12    and bad people.

13         MR. BUBALO:  Well, it's got to do with intent

14    versus simply negligence.  The jury has to decide whether

15    punitive damages is appropriate.  And in deciding whether

16    punitive damages is appropriate, they can either decide

17    whether Wyeth was intentional because of a motivation for

18    money or simply reckless or simply negligent.  So I think

19    that the motivation of why a tortfeasor is a tortfeasor is

20    absolutely relevant to deciding that tortfeasor's degree

21    of negligence.

22         MS. GONZALEZ:  Your Honor, if I may, with

23    respect to the sales trends data, which is what counsel is

24    referring to, we will be filing a separate motion in

25    limine on that evidence.  However, that testimony, when it

1    has been permitted, has been brought in through

2    plaintiff's expert epidemiologist, Dr. Donald Austin.  It

3    has not been brought in through Dr. Maloney.  It was not

4    necessary to be brought in through Dr. Maloney.

5            And I think the court has hit upon an issue that

6    we were going to discuss a little bit later with some of

7    the other experts, of when you're getting into whether or

8    not the company did the appropriate testing.  First of

9    all, we take issue with the plaintiff being able to say

10   that because they can't point to an objective standard,

11   but also getting into why and whether or not it is

12   appropriate for a plaintiff's expert, be it Dr. Maloney or

13   any other, to start opining on why they believe the

14   company chose not to do what they deemed to be the

15   appropriate testing.

16           So we would submit that it is not appropriate

17   for Dr. Maloney to testify to the so-called sales trend

18   and then to give opinion, expert opinion testimony to the

19   jury that he believes the sales are what prompted the

20   company to choose not to do the type of testing that other

21   experts believe should have been done.  We would

22   respectfully submit that is not appropriate testimony

23   under Daubert and it should not be permitted.

24           MR. BUBALO:  Well --

25           THE COURT:  You know, I see this as a motion in

 1    limine issue.  In other words, I don't think there's much

 2    doubt Maloney would be qualified to recite the sales

 3    figures.  I mean whether we need an expert to do that is

 4    another question.  Whether it's appropriate to get into

 5    this at all is another question.  I think those are motion

 6    in limine questions or admissibility at trial questions

 7    but not Daubert issues.

 8         I don't think anybody's challenging his

 9    credentials or his ability to say I looked at the annual

10    statement and here's what they listed.  So, let's defer

11    this one.

12         MR. BUBALO:  If I could just leave you with this

13    thought, Your Honor:  In almost every punitive damage

14    case, motivation is a factor.  A classic punitive damage

15    case actually occurred in St. Louis, which is a little

16    closer to where I was, and that was Domino's Pizza.

17    Domino's Pizza promised to deliver in 30 minutes and they

18    encouraged their drivers to go very fast to deliver in 30

19    minutes.  Why did they do that?  It helps sales, and they

20    were reckless because they wanted to increase sales.

21         I think that it's hard to separate the

22    motivation of a company, which is an issue for the jury,

23    on punitive damage because it shows their degree of malice

24    and negligence.  That's all I would say.

25         THE COURT:  Well, we'll save it for another day.

1   I think you ought to be prepared to address the 403 issue

2   with respect to uterine cancer and sales went down because

3   the defendant produced a product that caused this other

4   kind of cancer.

5          I think you almost don't need evidence on the

6   idea that if our product is linked to cancer, our sales

7   are going to go down.  If you need testimony on that,

8   then -- I don't know, the jury we have in this case is not

9   going to be a typical jury.  Anybody who lives in America

10  knows that.  So --

11         MR. BUBALO:  Well, Your Honor, I think also the

12  uterine cancer, viewing the prejudicial effect of

13  connecting the --

14         THE COURT:  Gee, everytime one of their

15  products, those bad people's products caused cancer, their

16  sales go down.  You know --

17         MR. BUBALO:  They kind of know that; I get your

18  point, Your Honor.

19         THE COURT:  Yes, and why in a breast cancer

20  trial is it appropriate to bring in through the back door

21  evidence that the defendant is also responsible for huge

22  numbers, allegedly, of uterine cancer?

23         MR. BUBALO:  Because -- well, that's a different

24  topic, Your Honor, and it's a medical topic, and it's not

25  related so much to this situation.  I agree it's a motion

1    in limine issue.  Specifically the uterine cancer issue is

2    a pharmacological issue.  It's notice that hormone

3    sensitive tissues in the body will respond to this type of

4    medication, reproductive hormones.  And it's one reason,

5    it's a red flag or signal that they should have have been

6    doing testing.

7            And so I'd like you to separate, if you can, the

8    issue of why this would be relevant by way of the

9    Scroggins opinion by the 8th Circuit, the 8th Circuit

10   found just the fact of uterine cancer relevant as notice

11   that testing needed to be done as to breast cancer and all

12   hormone sensitive cancers in general.

13           Now, coupling that with profit, I understand

14   your point.

15           THE COURT:  Well, okay.  I'm not sure you

16   completely understand my point.  Here's my point.  If the

17   defendant is being charged with bank robbery and the jury

18   learns that he robbed a bank before, they go, gee, maybe

19   he robbed a bank this time, whether he did or not.  If you

20   are allowed to bring in evidence that Wyeth is responsible

21   for large numbers of uterine cancer in the United States,

22   doesn't it -- isn't there a problem there when you're

23   trying to prove that the plaintiff here suffered breast

24   cancer as a result of use of the defendant's product?

25   That's what I'm trying to get at.

```
 1            MR. ROTMAN:  Your Honor, this is going to be
 2    briefed on a motion in limine.
 3            THE COURT:  Okay.
 4            MR. ROTMAN:  But -- and so we'll just keep it
 5    very brief just so we can leave it as, with the court
 6    having a very open mind about this, but one of the major
 7    issues in the case is that, although Your Honor made
 8    reference in the dictated ruling on differential diagnosis
 9    and Dr. Graham and Dr. Cronin to promotion and general
10    causation, the defendant's experts are denying general
11    causation and are not acknowledging promotion, and
12    endometrial cancer establishes a foundation for promotion
13    and a basis for supporting an additional line of evidence,
14    an important line of evidence that goes to the issue of
15    general causation, which we address in the brief, the
16    briefs on that motion in limine.
17            So those are the issues that's going to be,
18    there's going to be multiple -- the issue of endometrial
19    cancer and how it relates to the issues in this case in
20    large measure come from, come from defenses that have been
21    raised by the defendants, and it's just a question of are
22    we, as the plaintiffs, going to be allowed to present
23    important evidence that's relevant on a number of
24    different issues raised by the defense.
25            THE COURT:  Okay.  I just want you to be aware I
```

1    have a concern that if you're seeking punitive damages in

2    this breast cancer case based upon a history of the

3    defendant promoting a product that caused uterine cancer,

4    there's a risk that the jury is left with the impression,

5    gee, the defendant's products keep causing cancer so we're

6    going to award punitive damages here because they are just

7    a bad company.  That's not appropriate.

8              MR. ROTMAN:  I understand that.  We understand

9    that concern.

10             THE COURT:  Okay.

11             MR. ROTMAN:  And so we'll be taking up arguments

12   on this issue when we have a motion in limine hearing.

13             THE COURT:  Sure, yes, yes, we'll have a

14   hearing.

15             Okay.  The next one I had is Tilley and Austin.

16   Let me start with a question on Tilley and Austin because

17   it's my understanding that the testimony of Tilley and

18   Austin is intended principally to demonstrate an available

19   alternative to the products that the plaintiff used, is

20   that right?

21             MR. BUBALO:  Yes, sir.

22             THE COURT:  And that available alternative is --

23   its existence turns on the publication of studies in 2005

24   and 2007.

25             MR. ROTMAN:  So, Your Honor, the existence of

```
 1     the alternative is separate --

 2             THE COURT:  Watch those mics, when you get the

 3     papers on the mics -- sorry.

 4             MR. ROTMAN:  The existence of the alternative

 5     came about in the 1980's.  It's the later studies that

 6     show, that show that they are safer.  And like with the

 7     other issues of failure to study, the issue of why the

 8     information took that long to be studied is an issue on

 9     the negligence claim and failure to study claim of the

10     plaintiffs.  The defendant was selling a product that

11     needed an offset to the estrogen which was causing the

12     endometrial cancer, the progestin.

13             THE COURT:  No, I understand it.  Here's my

14     problem.

15             MR. ROTMAN:  And so --

16             THE COURT:  If there's no basis prior to the

17     plaintiff's death to show that the product, the

18     alternative product is safer, how can your experts testify

19     --

20             MR. ROTMAN:  Right.

21             THE COURT:  -- that there was available, at the

22     time that she took the product, a safer alternative?

23             MR. ROTMAN:  Because there's two separate

24     questions.  One question is was the product available.  It

25     was available.  It was approved by the FDA.
```

```
 1              THE COURT:  But there was no reason for anybody
 2     to understand it was safer until later.
 3              MR. ROTMAN:  And so the product being available
 4     is one issue --
 5              THE COURT:  Right.
 6              MR. ROTMAN:  -- and what people knew about it is
 7     another.  What we know today, our position is, is that
 8     it's a safer alternative.
 9              THE COURT:  Okay.
10              MR. ROTMAN:  And then the question is was that
11     known or knowable at the time.  It was knowable because
12     the studies that have been done in the year, in the 19 --
13     1990s and 2000s, could have been done earlier and should
14     have been done earlier.
15              THE COURT:  But you become quite remote at that
16     point.  You know, the radial tire should have been
17     invented sooner than it was because it's a safer
18     alternative.
19              MR. ROTMAN:  It was already invented.
20              THE COURT:  Yes.
21              MR. ROTMAN:  There was not --
22              THE COURT:  The radial tire was invented, too,
23     but it wasn't on the market.
24              MR. ROTMAN:  It was on the market.
25              THE COURT:  What you're doing -- well, okay, but
```

```
 1    nobody knew it was safer.  How can you fault -- you can
 2    stay wherever you want -- how can you fault the defendant
 3    and how can you put on expert testimony about a safer
 4    alternative when nobody in the world had evidence that it
 5    was a safer alternative?
 6              MR. ROTMAN:  So, I'd like to address your point.
 7    So, the message of that concern is we don't study, we
 8    don't know, we're safe from any kind of claim that
 9    would -- that attaches.
10              Now, safer alternative -- safer alternative in
11    our view is, is a question of do we know, do we know
12    whether it's safer.  Is there reliable science that it's
13    safer.  Separate issue is why wasn't that known sooner.
14    Now, there's evidence --
15              THE COURT:  But there's no liability --
16              MR. ROTMAN:  There's evidence --
17              THE COURT:  -- there's no liability for not
18    studying some alternative product.  You've got to show
19    liability.  One theory is they were promoting this product
20    rather than a safer alternative.  Okay.  But to do that,
21    you necessarily have to show that they knew it was safer.
22    You're faulting them for not doing what they have every
23    incentive to do.
24              MR. ROTMAN:  So, if we have evidence -- and I'm
25    representing to the court that we do -- if we have
```

1   evidence that going back to the, to a decade or more

2   before Mrs. Moss started taking hormone therapy, that

3   there were differences between a progestin that was

4   identical to the progesterone of the human ovary and the

5   synthetic projestin that they were using to be combined

6   with their Premarin product, that there were reasons to

7   know there were differences, that there were red flags,

8   and that there were calls, even by the United States

9   government, for study.  And so those red flags were not

10  being heeded, so --

11          THE COURT:  So what your theory is, the defense,

12  the defendant intentionally kept an unsafe product on the

13  market when it could have marketed a safer alternative and

14  presumably increased its market share because now they can

15  advertise, hey, this one doesn't even cause cancer.

16          MR. ROTMAN:  Mrs. Moss has a number of different

17  claims in the case, the Moss family, and one of them is

18  failure to warn, for example.  Failure to warn has a

19  proximate cause requirement where we need to be able to

20  put on evidence of what would have happened had an

21  adequate warning been provided.

22          Now, the choices are not just to take the drug

23  or not take the drug.  The choices include to take the

24  drug, to take it for a shorter period of time, to take it

25  for a different dose or to take a safer alternative.

1          THE COURT:  I'm not precluding any of that.

2    What I'm saying is you have another theory that there was

3    a safer alternative out there, but nobody knows it's

4    safer.  The Connecticut Product Liability Act does not

5    impose liability, strict liability for failure to, to

6    investigate and market some wonderful product that they

7    could investigate and market.

8          MR. ROTMAN:  Under a negligence theory?

9          THE COURT:  What you're saying is the defendant

10   had the opportunity to develop a better product that would

11   have made them a lot of money.

12         MR. ROTMAN:  Your Honor --

13         THE COURT:  They didn't do it and, therefore --

14         MR. ROTMAN:  Okay, right.

15         THE COURT:  -- they are liable to the plaintiff.

16         MR. ROTMAN:  Okay, so there's two separate

17   issues.  One is the evidence that there is a safer

18   alternative and the other is what liability theories or

19   causation theories or issues in the case would that be

20   relevant to.  Knowing that there's a safer alternative,

21   regardless of whether it was known at the time --

22   whether --

23         THE COURT:  Okay.  What cases say that you can

24   apply a hindsight theory to the question of whether

25   there's a safer alternative?  My cell phone today emits

1    less of a signal that's going to give me brain cancer than

2    the cell phone that I had ten years ago.  That's great.

3    And if ten years ago they knew how to do what they know

4    how to do today, I'm sure every manufacturer would have

5    marketed that way, but they didn't know.  Now they do so

6    they do.  This is the same thing.

7              MR. ROTMAN:  No, I understand, I understand your

8    point but I'm not, I guess, getting my point across, and

9    that is the experts are not advancing any legal theories.

10   They are not saying, they are not saying design defect.

11   They didn't even mention the term "design defect" in

12   their, in their reports.

13             THE COURT:  But their testimony has to be

14   relevant.

15             MR. ROTMAN:  Right, right, so they are saying

16   we've looked at the science and the science is saying

17   there's a safer P.  There is a safer P.  And then the

18   lawyers now have information and the judge has

19   information.  Is this relevant to the case on any theory,

20   on any issue in the case?

21             And so the issue of relevance comes in in

22   several places.  One is consumer expectation test.  One is

23   proximate cause for whether warning would have been

24   heeded.  Third is negligence, for example.  And fourth is

25   understanding general causation, because the very nature

1    of understanding the differences in the progesterone

2    versus the synthetic projestin is part of understanding

3    why E plus P is worse than Premarin alone in terms of the

4    breast cancer risk, which is a central theme in the

5    plaintiff's case, that estrogen plus projestin is just a

6    different drug.

7          THE COURT:  We're not talking about that with

8    respect to these two experts.  These two experts are on

9    the viable alternative product.

10          MR. ROTMAN:  They are components of their

11    opinion, is based on what does MPA do and what does oral

12    micronized progesterone do and how are those different.

13    And of course I think that's, I think that's an important

14    piece of understanding general causation in the case, but

15    it's also relevant, it's also relevant to those other

16    issues in the case.

17          The timing of when it was discovered to be safe

18    is a consideration perhaps for some issues and not others.

19    For example, if the issue of a warning generally would

20    turn on known or knowable and not just whether it was

21    known at the time, I mean the adequacy of a warning is not

22    based on --

23          THE COURT:  I just disagree with you.  You can't

24    warn against an unknown hazard.  You can't warn that there

25    may be some hazard discovered in the future that we don't

```
 1    now know about that you should be aware.  If you take this
 2    medicine, ten years from now people may discover it's
 3    unsafe in some way that we can't anticipate today.  That's
 4    not a warning I have ever seen required.
 5         MR. ROTMAN:  So -- our understanding is that the
 6    law with respect to warnings is, the adequacy of the
 7    warning is based on information that the company knew or
 8    should have known.
 9         THE COURT:  Correct.  So if there was a
10    published study -- in 2005 and 2007, studies had been
11    published 15 years earlier, you'd have a good argument and
12    there wouldn't be an issue with respect to these two
13    experts.  But those studies weren't published 15 years
14    earlier.
15         MR. ROTMAN:  What should have been known earlier
16    is that it was safer because there was reason, there was
17    reason --
18         THE COURT:  No, no.
19         MR. ROTMAN:  -- for the companies to be --
20         THE COURT:  No, no.  You're imposing way too
21    high a burden on a pharmaceutical company.  What you're
22    saying is every pharmaceutical company should do every bit
23    of research that we in hindsight can decide they should
24    have done as soon as they should have done it.  I don't
25    think that's the standard.  I think the standard is they
```

1    have to know what's out there.  And so if a study comes

2    out and if they either know about it or they could have

3    easily found it and it says here's a big problem, then

4    you've got a good warning claim.  They should have known

5    about the study.  These studies came out 15 years too late

6    for that.  She's taken this drug '93 to '99.  These come

7    out in 2005, 2007.

8          MR. ROTMAN:  The, the information that was

9    available to the pharmaceutical company was not that, not

10   what they know now that the studies have been done, but

11   what they knew was that there were differences among the

12   different progestogens, that there's a standard in the

13   industry that when you're using this synthetic drug that's

14   having off-target effects, that you need to investigate

15   the off-target toxic effects.  If the target of the

16   progestin --

17         THE COURT:  See, now you're getting back into

18   they are a bad company.  It doesn't have any bearing on

19   the plaintiff's claim.  The plaintiff has a CPLA claim.

20   That claim doesn't turn in any way on research that the

21   company might have done that no one in the world

22   apparently had done.  That can't be a basis.  You can't

23   take hindsight and say, you know what?  Fifteen years

24   later somebody did this.  This could have been done 15

25   years earlier.  Therefore, they are liable to us on the

1   CPLA.  That's just not how it works.

2          MR. ROTMAN:  Your Honor, when a population of

3   women are exposed like guinea pigs to a drug that hasn't

4   been tested and the company knows that the, that the drug

5   is a synthetic that's having effects other than on the

6   progesterone receptor, it's not acting just like

7   progesterone, they have an obligation to investigate how

8   was it affecting it differently?  And there were studies

9   showing different effects in different body systems.  Now,

10  that part --

11         THE COURT:  Think about what you're asking a

12  jury to do.  You're asking a jury to speculate when should

13  they have come to this conclusion; when should they have

14  started this study; how long would the study have taken;

15  what would the results of the study have been; would those

16  results have been challengable; would those results have

17  been verified; was the study large enough to satisfy

18  reliability, et cetera, et cetera.

19         I mean you're asking them to come up with an

20  alternative universe, and on the basis of that alternative

21  universe, impose liability in this case on your fourth,

22  fifth, sixth, eighth theory of liability under the CPLA.

23         MR. ROTMAN:  Where the relevance of the safer

24  alternative is not just on the seventh or eighth theory,

25  but is also relevant to Wyeth's affirmative defense under

1    the consumer expectation test, and --

2         THE COURT:  No, you just have it wrong in my

3    view on what it is the standard is.

4         MR. ROTMAN:  What is --

5         THE COURT:  They have to warn against dangers

6    that they know or should know about.  That means, that has

7    to mean not that they are required to do whatever research

8    we later decide they should have done at some earlier

9    point.  It's what is out there.  They have an obligation

10   to comb the medical literature and figure out what people

11   have come up with in terms of studies that would suggest

12   there's a danger in their product and then they have to

13   warn about that.

14        MR. ROTMAN:  Could I consult with Mr. --

15        MR. BUBALO:  Your Honor, may I approach and give

16   Your Honor actually some jury instructions based on your

17   Izzarelli case?

18        THE COURT:  Sure.

19        (Hands Court.)

20        MR. BUBALO:  And let me, if I may, on this one

21   point, I think it is an important point and if you could

22   turn, Your Honor, to page 23.

23        Page 23 is a negligence instruction that we

24   would tender in the case.  It's based on the standard

25   instructions in Connecticut on the website.  And, in fact,

```
1      the reason I wanted to give you this is because I'd like
2      to talk about this a little bit later but you see there's
3      a Bickler v. Eli Lilly (ph) case down there cited, Your
4      Honor.  And that case, if you're familiar with it, it's
5      about diethylstilbesterol.
6              THE COURT:  Just to be clear, these are
7      plaintiff's proposed jury instructions.
8              MR. BUBALO:  Yes, because I thought it would
9      help us talk about some of the issues in the case.
10             THE COURT:  Well, I just wanted to be clear
11     these are not the instructions that I gave to the jury.
12             MR. BUBALO:  It's based on the instructions that
13     you give to the jury on strict liability.  If you look
14     through, actually you'll find these instructions very
15     familiar.  They are your words but we have inserted --
16             THE COURT:  Well, all right.  Point me in the
17     complaint to where you raise a claim of negligent failure
18     to test, study or investigate.
19             MR. BUBALO:  Okay, Your Honor.  That was the
20     theory accepted by the 8th Circuit in the Scroggins case.
21             THE COURT:  No, I'm talking about this case.
22     Just cite me the paragraphs in the complaint where you
23     raise a negligent failure to test, study or investigate.
24             MR. BUBALO:  I have to get the complaint.
25             THE COURT:  Yes, please, do it.
```

1          (Pause)

2          MR. BUBALO:  And while we try to find the

3     complaint, let me talk about the theory.

4          THE COURT:  Okay.

5          MR. BUBALO:  A pharmaceutical company has a

6     failure, has a duty to test for the reasonable dangers

7     that it has notice of in its product.  Is there any debate

8     on that point?  Because if there is, we have, we have a

9     loggerhead we have to get over one way or another.

10          They have to do reasonable testing when they

11     know that there's a potential problem.  Their duty extends

12     beyond just sitting back releasing a drug product on the

13     market, waiting to see if it slaughters a few people and

14     then responding to it.

15          And that's the whole point behind

16     pharmaco-vigilance.  Pharmaco-vigilance is a discipline in

17     the industry where the pharmaceutical company is looking

18     for signals that will give it an idea that its product at

19     that point may offer a danger to those people who are

20     taking the product.  At that point it is the

21     pharmaceutical company, because they are in the best

22     position to do this, to research, study and test, and that

23     may include doing clinical tests or other activities.

24          THE COURT:  I'm willing to accept all that.  How

25     does that help Ms. Moss?

1          MR. BUBALO:  Okay.  So this is part of the

2     theory that every hormone therapy case that has gone to

3     trial is Wyeth's failure to test.  That's part of the

4     theory that's been accepted in Scroggins in the 8th

5     Circuit.

6          THE COURT:  And I'm with you on that with

7     respect to their product.  The argument that was being

8     made to me was they have an obligation to test, study

9     every potentially known or knowable alternative product.

10         MR. BUBALO:  They have an obligation to test if

11    there is a safer way to deliver the intended result.

12    That's part of the failure to test.

13         As early as the late 1980's and even earlier, we

14    can demonstrate that the industry understood that there

15    are different risks with different progestins.  We say it

16    is not consistent with ordinary prudence to just pick the

17    easy progestin and then market it.  So --

18         THE COURT:  If you are able to prove that this

19    product was defective, you'll win.  If you can't prove

20    that the product was defective, you'll lose.  What I hear

21    you saying is even if we can't prove the product was

22    defective, we're going to prove that some other product

23    should have been offered in its place.

24         What I'm struggling to understand is how is it

25    relevant to any claim that Ms. Moss actually made in this

1    case that a pharmaceutical company, acting perfectly,

2    would have tested, developed and marketed a safer

3    alternative that they had no reason, based upon the

4    studies actually available at the time that Ms. Moss took

5    this drug, had no reason to know was safer, more

6    effective, whatever.

7              MR. BUBALO:  They had reason to know that MPA

8    was dangerous, and they had reason to know that natural

9    progesterone, because of the pharmacology involved, may

10   not have presented the same dangers that MPA,

11   medroxyprogesterone acetate, would present.  And, in fact,

12   this is actually a classical -- let's go to strict

13   liability.  If strict liability concentrates on the

14   product -- and I don't want to belabor this point, Your

15   Honor, but if strict liability concentrates on the

16   product, it's not what should have been done, but what was

17   knowable at the time that the product was released.

18             THE COURT:  This is where I differ with your

19   theory of the case.  Knowable, in the plaintiff's view,

20   is, in hindsight, a really smart person could have put two

21   and two and two together and come up with this other

22   product that's better.  That's not knowable at the time.

23   What's knowable at the time is somebody's already put two

24   and two and two together and has published something about

25   it and the company darn well better be looking for that

1    and find it and realize, whoops, this has an effect on our

2    product.

3         But what -- the theory that I'm hearing is one

4    of perfect knowledge at whatever point in time you want to

5    pick, they should have known in 1990 what they now know in

6    2012 and should have acted upon that knowledge.  That

7    isn't the standard, I don't think.  And if you've got

8    cases that say that it is, that a defendant company has

9    the burden to -- or faces liability if they didn't develop

10   a product that they later developed that they in theory

11   could have developed years earlier, I'd love to see that

12   case because I can't imagine that's the law.

13        MR. BUBALO:  So as long as we separate the two,

14   it's not that you're saying the failure to test theory is

15   necessarily bad.  You're saying -- the issue we've having

16   is what's knowable.  And I'd like to, I'd like to have an

17   opportunity to brief that specific issue.

18        THE COURT:  I think you have a viable failure to

19   test claim but the failure to test is a failure to test

20   their product and understand what it is its risks were.  I

21   think you get into a whole different can of worms when you

22   start saying they had the duty to test and develop and

23   market something else.

24        MR. BUBALO:  And I very much appreciate your

25   explaining your perspective, Your Honor.  I have a better

1    understanding and am able to respond to you in that

2    regard.

3         I think a part of the failure to test is

4    comparing the different progestins that were available at

5    the time.  Had they compared the various progestins and

6    rationally selected those, and this is just our point and

7    I understand that the court disagrees, if they had

8    considered, which they should and which we can present

9    evidence that they should, that there are safer progestins

10   other than MPA, then they would have gone down the natural

11   progesterone route.  As it stood, they didn't even

12   consider that.

13        THE COURT:  But think about what you're saying.

14   You're saying that the company consciously avoided a safer

15   alternative that we have no reason to believe would be

16   less profitable to them, and to get all of this into

17   evidence, you have to show that -- you have to demonstrate

18   evidence that gives rise to liability for a product that

19   didn't exist at the time.  It's become so hypothetical

20   that I can't imagine that's good law.

21        MR. BUBALO:  Your Honor, could we do this?

22   Could you allow us some time to think about your points

23   here and maybe even submit additional briefs and consider

24   whether we at this time just want to withdraw this theory?

25   I understand where you're going with this, and I believe

1     we disagree because I believe it is a part of the failure

2     to test to consider whether there are safer ways to

3     deliver the same intended result in a patient.  And I

4     think you're kind of mixing motives with, with the

5     situation.

6              I can't explain why Wyeth necessarily did what

7     they did.  I'm shocked along the history of this why they

8     did what they did.  Why they didn't decide -- I have six

9     or seven other explanations of why they decided not to go

10    down the OMP route which would have been natural

11    progesterone versus the MPA route, all of which has

12    nothing to do with whether they could have had a better,

13    safer product.  That's not the point.  The point is when

14    they have notice that other progestins may be safer, they

15    should study that.

16             THE COURT:  Well, okay.  And I guess just to

17    give you, I hope, kind of the last word on what I'm

18    thinking here, I understand the concept of a safer

19    alternative to mean that it is currently available as a

20    product and known to be safer as a product.  And even

21    then, I think you've got some issues.

22             Look, every car manufacturer in America resisted

23    for years putting airbags in their cars.  The government

24    tried to force them and they just did not want to do it.

25    Okay?  Those airbags were available, they could be

1  marketed, they were out there, they are safer than seat

2  belts.  Is it a product liability claim that I owned a

3  1971 Cougar and it didn't have an airbag, even though

4  airbags had been invented?  I don't know.  I don't know.

5          MR. BUBALO:  And I understand your point.  I

6  don't want to -- I very much appreciate your willingness

7  to explain your views.  Thank you, Your Honor.

8          THE COURT:  Here's what I'm going to do though.

9  I'm going to grant the motion to preclude Tilley and

10  Austin.  That's without prejudice to later showing that

11  I'm mistaken about either the intended nature or relevance

12  of their testimony, and if I can be shown that they in

13  fact have relevant testimony to offer, then we'll

14  reconsider the issue of whether they can testify.

15          MR. BUBALO:  Your Honor, just to clarify, it's

16  not based on their qualifications or their science, but

17  based solely on an issue of law from your viewpoint.

18          THE COURT:  I'm not -- right, I'm not even

19  reaching those other issues, and this is without prejudice

20  to Wyeth coming back and saying for whatever reason that I

21  haven't addressed that they shouldn't testify.

22          I'm just saying what I see here is a claim that

23  is based upon hindsight.  Fifteen years or twenty years

24  after the relevant facts, studies emerged showing an

25  alternative product was safer and I don't think that

1    there's any basis for liability on the basis of that

2    combination of facts.  And, therefore -- and, therefore,

3    Tilley and Austin don't have anything relevant to say, as

4    far as I can tell, at this trial.

5            MR. BUBALO:  Right, and I understand, Your

6    Honor, that's based on a, a failure to -- it's based on

7    your view that the law does not allow a cause of action

8    under those circumstances.

9            THE COURT:  Essentially.  And also that there's

10   no obligation to create a product that can then be tested,

11   if you will.  But, rather, there's an obligation to test

12   their product and known alternatives.  All right.

13           MR. BUBALO:  But you asked earlier, Your Honor,

14   on negligence, paragraph 122 of our complaint we did

15   allege a negligent failure to study, and I don't think

16   that's really what we're really debating here.  You're

17   saying you can't hold them liable for studying something

18   that wasn't knowable.

19           THE COURT:  Well, I understood that claim to be

20   they didn't study their own drug.  They didn't, they

21   didn't pay for a test like the 2002 WHI test.

22           MR. BUBALO:  Right.

23           THE COURT:  That is what I understood the claim

24   to be, but I understood it to be a claim relating to their

25   actual product.  I didn't understand it to be a claim

```
 1      their R and D Department was somehow imposing liability on

 2      them because they hadn't invented and studied some other

 3      product.

 4              MR. BUBALO:  And I understand that, Your Honor.

 5      I understand your ruling.  Thank you.

 6              THE COURT:  All right.  Okay.  Let's be kind to

 7      the court reporter and take ten minutes.  We'll come back

 8      in ten minutes.  Stand in recess.

 9              (Whereupon a recess was taken from 11:40

10          o'clock, a. m. to 11:50 o'clock, a. m.)

11              THE COURT:  Okay.  I think we're up to Motion

12      Number 103 which is the motion to preclude testimony of

13      Hollon and Keegan.

14              Keegan has been withdrawn effectively so I'm

15      going to deny that motion as moot.

16              Hollon, I think the ability of Hollon to testify

17      is contingent upon what the evidence at trial shows.  My

18      current understanding is that there is not any real proof

19      that the plaintiff or her physician relied upon any

20      marketing materials, and so it's not clear how his

21      testimony is going to be relevant here.  But I want to at

22      least leave open the possibility that that foundation may

23      be laid.  So my current thinking is to grant it without

24      prejudice -- or actually deny it without prejudice and see

25      how things go at trial.
```

1              MS. GONZALEZ:  Your Honor, we understand your

2    ruling and we submit that you're correct.  Our position is

3    Dr. May establishes there is no reliance, but we

4    understand what the court has articulated and we'll take

5    it up at a later time.

6              THE COURT:  Yes, there was some ambiguity in

7    what she was saying so we'll see.  We'll see how it plays

8    out.  So I'm going to -- I'll grant the motion subject to

9    allowing the testimony if there's a foundation regarding

10   the marketing reliance laid at trial.

11             MS. GONZALEZ:  Then, Your Honor, just so I'm

12   clear, the way the court foresees things proceeding is

13   obviously Dr. May would have to take the stand and the

14   court would have to hear her testimony before the court

15   would reconsider whether or not Dr. Hollon would be

16   permitted to testify.

17             THE COURT:  Correct.

18             MS. GONZALEZ:  Okay.  Thank you, Your Honor.

19             MR. BUBALO:  Your Honor, may I --

20             THE COURT:  Yes.

21             MR. BUBALO:  May I comment on that for a second?

22             THE COURT:  Sure.

23             MR. BUBALO:  And this is an issue I have a

24   question mark on.  Again, that's why I brought these

25   tendered jury verdict instructions.  If you still have

1    them up there, there's on page number eight --

2              THE COURT:  Yes.

3              MR. BUBALO:  And I would appreciate the thoughts

4    of the court in that regard.  On page number eight, we

5    talk about an unavoidably unsafe product, and I think we

6    have to get to this issue.  The issue is whether in this

7    case there is a strict liability cause of action and we

8    would say there is, and Wyeth says no, there isn't,

9    because, because drugs are all unavoidably unsafe across

10   the board.

11             THE COURT:  Yes, well, you know, I think we're

12   going to get to that in a minute.  I tend to agree with

13   you that there's not a wholesale exception to the

14   Connecticut Product Liability Act for pharmaceuticals, but

15   the point of my ruling on Hollon is his testimony, the

16   relevance of his testimony depends upon the establishment

17   of a foundation that the marketing is relevant to an

18   issue.

19             So if you're trying to say that it may be

20   relevant even if Dr. May doesn't take the stand for some

21   other purpose, I'm open to that possibility.  I'm not

22   excluding that possibility.  I'm just saying right now I

23   don't see that Hollon's testimony is going to be relevant

24   because I don't think there's going to be a basis laid.  I

25   don't have a current understanding that there will, in

```
 1   fact, be an evidentiary basis to make his testimony

 2   relevant.

 3            MR. BUBALO:  Okay, so we can explain a little

 4   later.  I think it's very similar when you're talking

 5   about consumer expectations, you have to talk about the

 6   expectations of the product, and you admitted marketing

 7   material in your Izzarelli decision --

 8            THE COURT:  But that, that was a very different

 9   situation.  There was, there was litigation that barred

10   many typical claims against tobacco companies and the

11   theory of that case was principally a marketing, false

12   marketing claim.

13            MR. BUBALO:  And I think in order to form their

14   affirmative defense, they have to show that the matter --

15   that their product was properly marketed, and that's

16   actually in 402 comma K.

17            THE COURT:  And it may be after they put on

18   affirmative evidence, evidence in support of their

19   affirmative defense, if it turns out they've opened the

20   door to Hollon's testimony, then we'll take that up.

21            MR. BUBALO:  Okay.  Thank you, Your Honor.

22            THE COURT:  Sure.  All right.  Okay, Blume.  I

23   understand Blume is a hotly disputed witness.  This is

24   Motion Number 104.

25            Here's my thinking on Blume.  She should be
```

1    allowed to testify regarding her understanding of the

2    standard of care in the pharmaceutical industry based upon

3    her training and experience, even if that standard of care

4    has not been put down in writing or is not somehow reduced

5    to an objective set of principles that one can look up in

6    a reference manual.

7           It seems to me this is exactly what happens in

8    virtually every medical malpractice case in America.

9    There's a battle frequently over what is the standard of

10   care in a treatment of a particular condition and, here,

11   although we're not talking about medical malpractice, the

12   same it seems to me is true that there is a custom or

13   standard of care in the industry.  She seems qualified to

14   talk about that and it will, I think, be of value to the

15   jury and I don't see any reason under Daubert to exclude

16   her testimony to the extent that it focuses on that

17   standard of care.

18          So let me hear concerns about that.

19          MS. ROBERTS:  Thank you, Your Honor.  Your

20   Honor, and this is where Dr. Blume becomes difficult,

21   because on the one hand -- and I don't do a lot of medical

22   mal; I used to some time ago but I haven't for a while --

23   what's different though I think about this case is that

24   there isn't any dispute about what the appropriate

25   standard of care is, and the FDA is the body that governs

1   what kind of, what kind of requirements pharmaceutical

2   companies are going to have to comply with in the event

3   they want to market their products on the market.  And I

4   don't think that Dr. Blume disputes that reality.

5         I mean she has in her deposition acknowledged

6   that the FDA sets the standard, that the FDA does

7   indeed -- that's, the FDA is the body that allows a

8   company to market its product, that the FDA is required by

9   statute to make the determination, before it allows that

10  product to be marketed, that the company has performed

11  adequate tests by all methods reasonably applicable.

12  That's the standard of care.

13         THE COURT:  Sure.

14         MS. ROBERTS:  She does not dispute that, nor

15  does she challenge or question the finding by the FDA in

16  1994, 1995, and again in 1998, that indeed Wyeth had

17  performed adequate tests by all methods reasonably

18  applicable, again acknowledging that that's the only

19  standard of care.  Yet, she, as I understand her

20  testimony, intends to testify that nonetheless,

21  notwithstanding those standards and notwithstanding

22  Wyeth's compliance with those standards and her not

23  disputing the finding that they complied with those

24  standards, nonetheless she intends to testify that Wyeth

25  did not behave as a reasonable pharmaceutical company by

1    not engaging in a test similar to the WHI back in the

2    1980s.

3              So the question becomes, number one, how can she

4    trump what is the only legitimate standard governing the

5    conduct of this company and, two, what is she basing it

6    on?  And that's the question that we've posed in our

7    papers, Your Honor.  We don't believe that she's

8    identified any standard that can legitimately trump the

9    FDA, nor does she acknowledge that there is any custom or

10   practice that she can point to that would --

11            THE COURT:  Well, I think, I think I'd maybe

12   disagree about a couple characterizations there.  As I

13   understand it, what she intends to do is this:

14            She's acknowledging a minimum standard set by

15   the FDA and she's opining that there's a consistent but

16   higher standard set by industry practice that would

17   include the requirement, or the -- a more extensive

18   testing regimen would be appropriate under that industry

19   practice than the FDA minimum.  And that she is going to

20   suggest that that standard exists, that it was not

21   followed in this case and, you know, that the jury should

22   take that into account when deciding the reasonableness of

23   the actions of Wyeth.

24            MS. ROBERTS:  Well, and again, Your Honor, the

25   only thing I would point out, an additional point I would

make is that when asked to identify what that industry

standard or what that custom or practice is, she's not

able to go further than to say it's out there and it

exists.  And when I asked specifically, well, what exactly

was Wyeth appropriately to have done consistent with this

so-called industry practice and standard, she says, well,

there is no set standard for the testing.  Every company

has to do what's appropriate for their product.

I would submit, as we did in our papers, Your

Honor, that that answer in itself belies the notion of

there being a standard by which she and/or our jury can

judge the appropriateness of Wyeth's conduct.

But I think it creates and will create

confusion once the jury hears indeed there is this

standard and the company has complied with that standard.

Dr. Blume's opinion that there's something else that they

should have done, notwithstanding her ability to point to

what that standard is, I think, is going to create

confusion for the jury.

Again, I think -- and I'm not going to beat a

dead horse; I learned not to do that a long time ago --

but our concern is that this is not a case where one has

to necessarily go into custom and practice, and within the

context of pharmacology, we are -- my word -- blessed with

having some clear guidance with respect to what the

 1    company is expected to do and not to do.

 2            Had Dr. Blume taken the position that the FDA

 3    standard is A and B and in my opinion the FDA was wrong in

 4    its conclusion that Wyeth had complied with that standard,

 5    that would be a different story.  She doesn't say that.

 6    She says, in fact, that she does not take issue with the

 7    FDA's decision.

 8            THE COURT:  Right.

 9            MS. ROBERTS:  And so that's what creates the

10    confusion and we think necessarily invites this jury to

11    trump and opine about some ambiguous standard that's

12    frankly in the mind of Dr. Blume and no where else.

13            But I don't know what else I can tell you that's

14    not already in the papers.

15            THE COURT:  Yes, I would agree with you if there

16    was a conflict between the industry standard and with what

17    the FDA says, but I don't understand that to be her

18    position.  I understand what she's saying to be the FDA in

19    a sense is setting the floor; industry practice is setting

20    a somewhat higher standard, and that's not unlike the

21    medical malpractice context where someone may have

22    complied with the minimum either statutory, regulatory or,

23    you know, institutional written policy and still be found

24    to have violated the standard of care because doctors in

25    the community always do X or always refrain from doing Y.

1              And if I'm wrong and she starts testifying in

2      some other way, then you ought to jump up and object, but

3      it seems to me that, as I understand it, she's essentially

4      saying there is an industry standard that's higher than

5      the FDA minimum and I don't know that I can say that

6      that's inappropriate.

7              MS. ROBERTS:  And, Your Honor, were she able to

8      point to -- and that's the amazing missing link in her

9      testimony -- examples of behaviors by companies in Wyeth's

10     shoes over the years, to demonstrate the existence of that

11     higher standard, then there might be something to that,

12     but she has consistently failed to do that, which is why

13     frankly other judges -- and I hate to make this argument

14     but I will -- other judges have found her testimony to be

15     lacking.  She has consistently failed to be able to point

16     to a demonstrated record or evidence of there being a

17     standard above or beyond, or a practice above and beyond

18     what the FDA mandates that companies do.

19             And that's where we were troubled, because I

20     think the court would be -- is correct in that there can

21     be circumstances where the industry, the fill-in-the-blank

22     industry, determines that it's going to go above and

23     beyond what they are required to do by statute, but that's

24     not been demonstrated on this record in this case, or

25     frankly in any of the other HRT cases.

1          THE COURT:  Well, okay.  This may be a situation

2    frankly you make a motion at trial to strike if, in fact,

3    her testimony turns out to be as kind of meaningless as

4    you're suggesting it's going to be.

5          But, but at this point, you know, I'm kind of

6    faced with the gatekeeper issue and it seems to me that

7    she's got qualifications, she's got the training and

8    experience, she's suggested that there is this industry

9    practice, and right now what I'm hearing is you've got

10   kind of a fantastic cross examination.  So we'll see how

11   it goes.

12         MS. ROBERTS:  That's fine.

13         THE COURT:  I'm going to deny the motion with

14   respect to Dr. Blume.

15         Next is Number 105, to preclude the opinion of

16   treating physician Dr. Patel.  Let me just comment quickly

17   on this.  It's not clear to me that the plaintiff intends

18   to use Patel in what I would say is a genuinely expert

19   role.

20         If what the plaintiff intends to do is say,

21   Dr. Patel, you treated the plaintiff?

22         Yes, I did.

23         You ordered X, Y and Z test or you instructed

24   her to stop taking the medication or whatever?

25         Yes.

1          Why did you do that?

2          "Why did you do that" is in my view factual

3     testimony, and if that's how the plaintiff intends to use

4     Patel, then I don't think we have a Daubert issue at all.

5          It becomes a little trickier if Dr. Patel is

6     going to be used as a traditional expert, one might ask

7     why he isn't completely cumulative of several other

8     experts in the case, but I guess I'm really focusing on

9     plaintiff's counsel and trying to figure out how he's

10    going to be used.

11         MR. ROTMAN:  Your Honor, Dr. Patel will be used

12    to explain, as set forth in our brief, what he testified

13    to in his deposition.  So it goes more than to I ordered

14    this test and why, but it doesn't go much further than

15    that.  It goes to I ordered this test and why, but the why

16    part includes what's it mean, what's the significance of

17    it and, you know, how does he interpret that result.

18         The issue that the defendants have challenged

19    relate to his opinion about what it means to have the

20    result from the pathology test that he order on estrogen

21    receptor, and in response to Wyeth's lawyer's question

22    about what it means, he explained what it means in a way

23    that's entirely consistent with what mainstream science

24    says it means.

25         So would I be asking him at trial what it means

1    to have this test?  Yes.  Why would I be doing that and

2    would it not be cumulative?  Because --

3              THE COURT:  Well, let me just pause right there.

4    What it means to have this test is an explanation of what

5    he did as a treating physician.

6              MR. ROTMAN:  You don't see --

7              THE COURT:  I don't understand why that is an

8    expert opinion, so somebody --

9              MS. ROBERTS:  Your Honor, again, I think our

10   papers make clear we are not suggesting that Dr. Patel as

11   a treating physician should be excluded.  There are a

12   number of opinions -- and I don't know if the court had an

13   opportunity to review the deposition --

14             THE COURT:  I've read it all.

15             MS. ROBERTS:  I'm sorry to hear that.

16             There were a number of opinions that were

17   elicited by counsel from Dr. Patel and 99.9 percent of

18   them, which he himself kept saying I'm not an expert, I'm

19   not an expert, those are the opinions that we're concerned

20   about.  And so, if the court can pin counsel down to let

21   us know exactly what testimony he would expect to want to

22   be able to elicit from Dr. Patel, we can probably have a

23   more intelligent conversation.  But it's true that we're

24   not seeking to exclude him in total, because he was a

25   treater.

1          MR. ROTMAN:  The opinion, whether you would call

2     it an opinion or not, he was asked by Wyeth's counsel

3     whether being estrogen receptor positive, what that means,

4     and his answer was it means that it requires estrogen to

5     grow.  And Wyeth challenged that opinion in its Daubert

6     brief and we supported it as reliable mainstream medical

7     science.  And so we've disclosed that opinion and we would

8     want him to be able to testify about that opinion.

9          If the issue is about cumulative, then the

10    question is if the, if the jury hears a plaintiff's expert

11    say that estrogen receptor positive means X, and here's a

12    defense expert saying that estrogen receptor positive

13    doesn't mean X, then hearing a treating physician weigh in

14    on a subject which is standard to, you know, the

15    fundamentals of ordering the test and understanding why,

16    why you ordered the test, helps a jury to decide, well,

17    who's right here?  The plaintiff's expert says this, the

18    defense expert says that, what do the treating physicians

19    have to say?

20         Because on pretty much everything that our

21    experts have to say on issues that are, that are crucial

22    to the causation case, the defense experts don't agree.

23    So we did have an issue of -- you know, you might say a

24    tie, at least with respect to, you know, one expert says

25    this and one expert says that.

```
 1              THE COURT:  Okay.  The questions that get beyond
 2    an explanation of what the treater did as a treater are
 3    potentially problematic.  Okay?  You know, is it your
 4    understanding that prolonged estrogen usage can take a
 5    normal cell and turn it into a cancerous cell, or is it
 6    your understanding that estrogen can affect a cancerous
 7    cell and may give that fuel to proliferate?  I think
 8    there's a valid objection there to this being an expert
 9    opinion question, because that's not an explanation what
10    he did as a treater.  And he basically is, is kind of
11    admitting that he doesn't have a basis to answer the
12    questions beyond what it is that he did as a treater.
13              MR. ROTMAN:  Okay.
14              THE COURT:  So the difference between that
15    question and, for example, "Estrogen receptor was reported
16    as a three plus (300).  Do you see that?"
17              Answer:  "Yes."
18              "What does that mean to you?"
19              "I think these are gnostic classes.  The scoring
20    is done on three levels," et cetera, et cetera.  That, I
21    think, relates to what actually happened to Ms. Moss and
22    her treatment and that's an appropriate question and
23    answer, it seems to me, as a factual matter.
24              So I don't know if I'm helping both sides or not
25    but --
```

 1              MR. ROTMAN:  Well --

 2              MS. ROBERTS:  I'm sorry but --

 3              MR. BUBALO:  Your Honor, I'm sorry to interrupt

 4    but maybe we can cut through this.  If both sides

 5    stipulate, we won't ask any Dr. Patel any causation

 6    questions if the other side doesn't and that will solve

 7    the problem.  Right?

 8              MS. ROBERTS:  We can talk.  I wish counsel had

 9    raised it earlier.

10              MR. BUBALO:  I mean I think that -- I know I'm

11    interrupting and I apologize, but on the other hand, it's

12    a practical solution.

13              THE COURT:  Let me get back to my initial point.

14              MR. BUBALO:  Okay.

15              THE COURT:  My initial point is if you're asking

16    a treater a question that relates to the treatment and the

17    doctor's understanding of what the procedure was, what the

18    significance of a test was, why he or she did something,

19    all of that is not expert.  That's factual and it's

20    related to what the doctor did in the actual treatment of

21    the patient.  All that comes in as fact testimony.

22              Where you get into a problem is where you're

23    pushing beyond that and you're trying to get the treater

24    to do exactly what you were saying, vouch for your experts

25    as opposed to somebody else.  And that's where the treater

1    is saying, whoa whoa, wait a minute, I'm not sure that I

2    really can do that.  And so I'm not sure he really can do

3    that.

4                MR. ROTMAN:  Well, if we have, if we have

5    disclosed him under Rule 26 --

6                THE COURT:  Right, but here's the problem.  You

7    can disclose him under Rule 26 and that just begs the

8    question under Daubert, when he says, well, I'm not an

9    expert on this.  How do you get them in?

10                MR. ROTMAN:  Well, he said he -- I think that

11    that oversimplifies what he said.

12                THE COURT:  It doesn't oversimplify it --

13                MR. ROTMAN:  He has read about the effect of

14    hormones on cancer.  He's been ordering this test, this

15    estrogen receptor test, for many years.  He was the

16    director of the cancer board.  He understands something

17    about cell biology.

18                THE COURT:  Why did you order the test.

19                MR. ROTMAN:  Why did you order the test and

20    what's the significance of the test.

21                THE COURT:  That's factual.  Why did you -- this

22    is not hypothetical.  Doctor, you ordered this test; why

23    did you order that test?  I wanted to find out if she was

24    positive for this indication or not.

25                MR. ROTMAN:  But it goes a step beyond.

1          THE COURT:  Why did you want to know that?  I

2    wanted to know that because that affects my treatment of

3    the patient.  I mean --

4          MR. BUBALO:  Thank you, Your Honor.  I think we

5    can avoid this just by stipulating that either side --

6          MS. ROBERTS:  You know, I don't want to --

7          MR. BUBALO:  -- not ask causation questions.

8          MS. ROBERTS:  I don't want to -- frankly, Judge,

9    I want the court to rule.

10          THE COURT:  Yes, I'm going to rule and you guys

11    can stipulate if you want to.

12          Look, I'm going to grant the motion to the

13    extent that it seeks to preclude Patel from testifying

14    beyond the scope of his treatment of the plaintiff and the

15    basis for what he did, what he wanted to find out and why.

16    That's without prejudice to demonstrating that this fellow

17    is an expert and can, in fact, testify on some broader

18    issue.

19          I haven't seen that he's suggesting that he can

20    do that, and I think he's going to fail a Daubert test on

21    that basis.  If you guys want to stipulate one way or the

22    other, I would encourage that.  But, for now, I haven't

23    seen any basis on which Patel can act as an expert beyond

24    the scope of what I've already carved out.

25          So -- but come back and point me to specific

```
 1    questions and a basis for believing that he's qualified to
 2    serve as an expert there and I'm happy to revisit that.
 3              Okay.  We have almost the same situation with
 4    Pezzimenti which is Number 126.  He's a treating
 5    physician.  And again, as is always true, a treating
 6    physician can testify about the treatment, the tests
 7    ordered, why they did what they did and that's not expert,
 8    so none of that is going to be affected by this ruling.
 9              The question, I think, is whether the broader
10    opinion that hormone therapy was more likely than not a
11    substantial contributing factor to the promotion of
12    Mrs. Moss's breast cancer I think is really at the heart
13    of the issue.
14              I don't understand Pezzimenti to be in any
15    different situation than Cronin and Graham.  So, if I'm
16    missing something let me know.  In other words, I
17    acknowledge that Pezzimenti may be being offered for a
18    purpose beyond simply his treatment, but to the extent
19    that he's qualified by training and experience and he's
20    followed differential diagnosis, which I've already held I
21    find to be a reliable methodology, and to the extent he's
22    reliably applied it in essence in the same way that Graham
23    and Cronin did, why is there -- why should there be a
24    different ruling?
25              MS. ROBERTS:  Well, Your Honor, because -- I
```

1    obviously listened very carefully to the court's colloquy

2    with Mr. Evans and I'm not going to dispute that.  The

3    only thing I want to point out, what's interesting about

4    this witness is that when he was testifying before the

5    designation, he was very specific that he did not apply

6    the differential diagnosis.

7             In fact, I think we point out in our papers that

8    he testified -- Answer:  "Differential diagnosis does not

9    apply to the causation of cancer or any disease.  It only

10   applies to the disease.  It doesn't apply to the cause of

11   that.  Differential diagnosis is restricted to the

12   diagnosis of an illness, not the cause of the illness."

13            And then, inexplicably, especially since he

14   wasn't even aware that he had been designated as an expert

15   by the plaintiffs, he testifies, well, yeah, I actually

16   did apply -- apply differential diagnosis.  So I mean I

17   don't know what to make of this witness.

18            THE COURT:  That was at his second deposition?

19            MS. ROBERTS:  I'm sorry?

20            THE COURT:  His second deposition is clearer

21   that he applied the --

22            MS. ROBERTS:  That is correct.

23            THE COURT:  Right.

24            MS. ROBERTS:  But what's difficult here, and

25   maybe I'm anticipating what the court's about to tell

1    me -- but it does suggest to me some problem about whether

2    or not he did it, in fact, or if he did it appropriately

3    or --

4            THE COURT:  Well, looking at this charitably,

5    and to a certain extent I think I need to do that, isn't

6    he basically saying I don't know what created the first

7    cancer cell in Mrs. Moss --

8            MS. ROBERTS:  Yes.

9            THE COURT:  -- but I can opine that the hormone

10   therapy was a substantial cause in promoting her cancer.

11   I mean isn't that the distinction we're drawing once

12   again, the initiation versus the promotion?

13           MS. ROBERTS:  I think the court's right.  I'm

14   not suggesting that that's not what he's doing, but for

15   the reasons that Mr. Evans stated, we think that that's,

16   that that's insufficient as a matter of law.

17           THE COURT:  I think it comes down to your

18   crossing him, and I assume his answer's going to be I

19   can't tell you by way of differential diagnosis what

20   created that first cell.  I can't do it.  Nobody can do

21   that.  But I can tell you by differential diagnosis that I

22   can reach an opinion that her use of hormone therapy sped

23   up, fostered, promoted, whatever, the growth of her cancer

24   cells.

25           MS. ROBERTS:  And the point I was making, Your

1   Honor, is that he did not appear to think he could make

2   that distinction when he was deposed the first time, and

3   for reasons that I can't understand, he could the second

4   time.

5           THE COURT:  I looked at that testimony, and I

6   admit, in the light most favorable to the plaintiff here,

7   is that there was kind of a semantics problem and that he

8   was, I think what he was trying to say is I can't tell you

9   what sparked her cancer.  But, you know, presumably what

10  he's now saying is he could tell you what sped it up or

11  promoted it.  So -- and I think that's consistent.  In

12  other words, I don't think anybody suggests that

13  differential diagnosis can be used to say what created the

14  first cancer cell.  No one's suggesting -- I haven't seen

15  any expert suggest that.

16          I think what they are saying is they are able to

17  use this method to help figure out whether the hormone

18  therapy facilitated or promoted or sped up, worsened the

19  spread, growth, development of the cancer.

20          So I'm going to allow Pezzimenti essentially for

21  the reasons I've described.

22          MS. ROBERTS:  Your Honor, the only thing, other

23  thing we would submit is his testimony would be

24  cumulative.

25          THE COURT:  It may well be.  And like I said

1    before, we've got three or four or five experts who are

2    all saying essentially the same thing and there will come

3    a point presumably where that may become an issue.

4            MS. ROBERTS:  All right.

5            THE COURT:  So I'm going to deny the motion to

6    exclude Pezzimenti's expert testimony.

7            We've got Eckel and Michaels and I think they

8    can be taken up together and I think maybe the rulings

9    here are going to be the same.

10           I think their testimony should be limited to

11   their disclosure in their deposition, which I think is

12   what plaintiff is agreeing to, but I don't think I should

13   have a broad bar on any specific causation-oriented

14   testimony.

15           I think what this kind of comes down to is

16   whether they can use general causation theory evidence, et

17   cetera, to undercut and oppose any specific causation

18   opinion, and I think that, it seems to me that this should

19   be possible.

20           So, my current thinking is to deny -- well,

21   grant in part and deny in part the motion with respect to

22   Eckel and Michaels and limit them to their disclosed

23   opinions in their disclosure and in their depositions.

24           MR. EVANS:  Your Honor, I would only add with

25   respect to Michaels, we also think him being designated as

1    a rebuttal expert is improper, and we will raise that

2    downstream, but the concept of the issues that were

3    disclosed in our pathology report was known to

4    Dr. Michaels, he's been in this litigation for a long time

5    and he's had plenty of cases where these exact same issues

6    are there, so this notion that somehow he's a proper

7    rebuttal witness I think is just incorrect.

8            And the plaintiff's concept that, well, I think

9    it matters that -- to have us have to put on a pathology

10   expert and have them bring in Dr. Michaels to say, oh,

11   what he just said I disagree with generally and I'm not

12   going to offer a specific opinion, I think that's

13   improper, but we can deal with that at trial, Your Honor.

14           THE COURT:  Okay, all right.  I think that

15   resolves all of the Daubert motions.  Did I miss one?

16           MS. ROBERTS:  I don't think so, Your Honor.

17           MR. BUBALO:  I don't think so, Your Honor.

18           THE COURT:  Let's turn to summary judgment.  I'm

19   going to try the same approach, if I can, and kind of tell

20   you where I'm leaning and give you a chance to focus your

21   arguments.

22           Okay.  Let me start, as I always do, with the

23   standard of review, because although it's well known, it's

24   worth reminding everybody what it is.  The standard on

25   summary judgment is that I look at the record evidence in

1   the light most favorable to the nonmoving party, draw all

2   reasonable inferences in favor of that party, and decide,

3   looking at the evidence in that light, whether any

4   reasonable fact finder could rule in favor of the

5   nonmoving party or, instead, whether judgment should enter

6   as a matter of law.

7          The ultimate question is whether there are

8   genuine issues of material fact that require resolution by

9   a fact finder or, instead, whether a party's entitled to

10  judgment as a matter of law.  And that well known standard

11  is what I'm going to be applying here.

12         I will try and run through quickly the various

13  general approaches or arguments taken by Wyeth toward the

14  multiple claims here and give you a sense of where I'm

15  going.

16         Although technically correct in one sense, the

17  failure to plead the CPLA claims as they should have been

18  pled in the complaint is not in my view a basis for

19  granting summary judgment on the merits against the

20  plaintiffs.  The courts have frequently faced this problem

21  and have developed the approach of treating common law and

22  other claims that are subsumed within the CPLA as claims

23  raised under the CPLA in treating the various claims in

24  effect as different theories under that statute, and

25  that's what I think should occur here.

1        By the same token, to the extent that there's a

2   complaint that the complaint is not sufficiently specific

3   under Federal Rule of Civil Procedure 9(b), that, to the

4   extent it hasn't been waived, is not a basis for granting

5   summary judgment.  At best, it would be a ground for

6   dismissing and requiring a repleading of the complaint.

7        I don't believe at this point, given the

8   tremendous amount of work that has been put into this case

9   and the great amount of discovery that has been

10  undertaken, that there is any great need to have an

11  amended complaint properly stating a CPLA claim be filed.

12  Instead, I will do what typically is done and simply treat

13  it as having been properly pled under the CPLA.

14       The statute of limitations defense I believe

15  also fails, although it has surface merit.  The plaintiff

16  discovered she had cancer in October 1999 and did not file

17  her complaint until September 2004, which is beyond the

18  three year statute set forth in the Connecticut Product

19  Liability Act.  However, the statute provides that any

20  such claim has to be brought within three years from the

21  date when the injury, death or property damage is first

22  sustained or discovered or in the exercise of reasonable

23  care should have been discovered.  And that is Connecticut

24  General Statute 52-577a-(a).

25       The statute, therefore, takes a somewhat

 1    different view than traditional tort law in Connecticut

 2    and that is the term "injury" with respect to the start of

 3    the statute of limitations has been interpreted as being

 4    synonymous with legal injury or actionable harm, and I

 5    would cite Lagassey, L-A-G-A-S-S-E-Y, v. State, 268 Conn.

 6    723 at 748.  As well as Tarnowsky v. Socci, 75 Conn.App

 7    560 at 569.

 8            Actionable harm here occurs when the plaintiff

 9    discovered, or in the exercise of reasonable care should

10    have discovered, the essential elements of a cause of

11    action, again citing Lagassey.  Thus, a claim accrues when

12    the plaintiff has knowledge of facts that would put a

13    reasonable person on notice of the nature and extent of an

14    injury and that the injury was caused by the negligent

15    conduct of another.

16            Here, the difficulty is, and the argument I

17    guess is that Wyeth claims because there is a warning that

18    mentions breast cancer that's issued in connection with

19    the sale of the product, because the physician, Dr. May,

20    understood that there is some possibility that the product

21    can cause cancer, that the plaintiff was on notice as soon

22    as she was diagnosed that her use of the product was the

23    potential cause of her injury.

24            I don't think that satisfies the actionable harm

25    standard because it would require the plaintiff in effect

1    to bring a suit prematurely before there was any good

2    faith basis within the meaning of Rule 11 to sue a

3    particular defendant.

4         One can imagine that a particular plaintiff

5    might have used three or four different medications, each

6    of which has a breast cancer warning.  Should a plaintiff

7    who discovers she has breast cancer be required to

8    immediately sue every pharmaceutical company of every

9    medication she's ever taken that has such a warning on it?

10   I don't think that's what the state law intends and I

11   don't think that's what the state law requires in this

12   case.

13        Here, I think a reasonable jury could find that

14   Moss could not have reasonably discovered the essential

15   ingredients of her cause of action, specifically including

16   Wyeth's breach of duty in supplying an unreasonably

17   dangerous product and failing to adequately warn of the

18   risk of its long-term use until the existence of those

19   heightened risks, and their causal link to her disease,

20   became public knowledge.

21        That happened, it seems to me, only with the

22   publication in 2002 of the WHI study.  At that point,

23   certainly she had the information she needed to put two

24   and two together and realized she had a cause of action

25   potentially against the defendant.

1              In any event, the ability of the plaintiff to

2      discover actionable harm triggering the statute of

3      limitations is typically a question of fact, not properly

4      decided on summary judgment.  And, again, that's Jackson

5      v. Tohan, 113 Conn.App 782 at 790.

6              So, what we have here is a situation in which

7      the statute of limitations arguably was satisfied by the

8      plaintiff's filing of a lawsuit within three years of the

9      publication of the first public study that made it clear

10     that she had a cause of action against Wyeth.

11             The plaintiff has brought a fraudulent

12     concealment cause of action as an alternative ground for

13     tolling the statute of limitations.  I will be frank that

14     I think that there are some potential problems with that

15     cause of action, notably whether that tolling theory would

16     require some proof that the defendant sought to conceal

17     facts for the purposes of obtaining a delay on the

18     plaintiff's part in filing a complaint on her cause of

19     action.

20             What we have here, it seems to me, is a theory

21     that one might call fraud on the market.  The theory is

22     that Wyeth sought to preclude anyone from understanding

23     the connection between the use of their product and breast

24     cancer, but it's not apparent that that was done in order

25     to obtain delay on any particular person's part in the

1    filing of a cause of action.

2         I'm not going to rule on the fraudulent

3    concealment issue today because I think it's unnecessary

4    in light of my belief that the statute of limitations

5    could be found by a jury to be satisfying in this case.  I

6    do think we'll have to take that up at some point before

7    trial because it's going to affect presumably the scope of

8    the evidence that's admissible at trial.  So I would urge

9    both sides to think and perhaps confer on that topic.

10         I think there are, with respect to the claim

11   that summary judgment should enter on the adequacy of the

12   warnings, I think there are genuine issues of material

13   fact that preclude summary judgment on that topic.

14         The argument, as I understand it, is essentially

15   the Wyeth warnings were approved by the FDA, the labels

16   specifically warned there was some risk of breast cancer,

17   and that Dr. May disclosed the risks in the warning to the

18   plaintiff and that ends the question.  I don't think that

19   that's true.  The adequacy of the warnings, I think, is

20   still a disputed issue of fact.

21         The warnings basically mention breast cancer but

22   they suggest that the risk of breast cancer exists

23   principally, or arguably even exclusively, for women who

24   use the product at high dosages over a long period of

25   time.  So we don't -- we can't say as a matter of law that

1    that warning was adequate to warn Mrs. Moss that the

2    product she was taking raised for her a potential risk of

3    breast cancer.

4         The requirement is that the warning raise the

5    specter of the, quote/unquote, "exact injury" that a

6    plaintiff has suffered in order to be adequate, and it

7    seems that the exact injury arguably has not been warned

8    of here where the dosage and period usage restrictions

9    were in the warning.  If the warning had said quite

10   simply, "Warning:  Use of this product has been associated

11   with breast cancer," then I think Wyeth would have a

12   strong argument that its warning was adequate.

13        What we have instead is the language that can be

14   read as minimizing the risk for most users.  Some

15   studies -- or, excuse me -- most studies have not shown

16   this association.  Some have, but principally with high

17   dosages over long periods of time.  There were so many

18   qualifiers in the warnings that it reasonably can be read

19   to have not warned of the exact injury here, even though

20   it warned of the disease that the plaintiff eventually

21   succumbed to.

22        So I think that a jury could find that the

23   warning labels here were inaccurate, misleading or

24   incomplete in their warning to Ms. Moss of the risk she

25   faced from use of the product.  And, accordingly, it seems

```
1    to me that issue is one that has to be resolved by the
2    jury.
3              Wyeth has also raised a claim that there is a
4    lack of proximate cause here because Dr. May communicated
5    some information of the risk of breast cancer to
6    Mrs. Moss, and unless the plaintiff can show that Dr. May
7    would not have prescribed the medication, then the
8    plaintiff necessarily -- had adequate warnings been made,
9    then the plaintiff necessarily loses.  I don't think that
10   that's, again, a winning argument.
11             The plaintiff at this point is the beneficiary
12   of every reasonable inference, and it seems to me that
13   there are a number of facts that give rise or could give
14   rise, should a jury wish to raise them, to reasonable
15   inferences that would allow this claim to survive.
16             The first is when Mrs. Moss was told she had
17   cancer, she stopped using the drug.  The second is that
18   the number of patients to whom Dr. May prescribed the drug
19   fell after disclosure of the 2002 report which, as I
20   recall, Dr. May described as saying created in effect
21   pandemonium or chaos, something along those lines, in the
22   field when it was released.
23             There was some indirect testimony from family
24   members.  I understand that there's a hearsay problem
25   there, but it seems to me that it's not completely clear
```

1    that there will be no evidence from which a jury can infer

2    what Mrs. Moss would have done.

3            She certainly -- there's evidence that she read

4    the warning labels, so she was keeping herself up on the

5    risks that were attendant with her use of this product,

6    and the fact that she and her doctor discussed the risks

7    and benefits of using the products suggest she would have

8    been open to understanding the actual risks and, even if

9    her doctor was willing to prescribe the product, she

10   might -- a jury could infer that she nonetheless would

11   have decided not to take the product had she been informed

12   of the actual risks of breast cancer.

13           So, I don't know how strong a claim this is on

14   the plaintiff's behalf but it seems to me that there's

15   enough in the record, taking all the reasonable inferences

16   in favor of the plaintiff, to allow that to reach the

17   jury.

18           I think the, as things now stand, the

19   alternative design theory probably is going to go down to

20   summary judgment because Drs. Austin and Tilley at the

21   present moment are not going to be testifying.  I'm going

22   to make that ruling without prejudice to again further

23   developments as we've discussed already.  If it turns out

24   that Austin and Tilley are permitted to testify because

25   I'm convinced that I've made a mistake here today, then

1    that would potentially open up the alternative design

2    claim.

3            I don't understand Comment (k) of Section 402A

4    of the Second Restatement of Torts to bar the claim in

5    this case.  Just quite simply, I don't understand that to

6    be the case.  I think there's -- the failure to warn is a

7    defect in itself.  Whether or not the fraud is

8    unreasonably dangerous, I don't understand Connecticut to

9    have held that all pharmaceuticals are by definition

10   unreasonably dangerous.  I think the defendant is going to

11   have a difficult time arguing that its product is not

12   unreasonably dangerous for purposes of the CPLA.  It takes

13   the position that all pharmaceuticals are unreasonably

14   dangerous but that's a strategic issue I'll leave to

15   counsel.

16           It seems to me that there are, there are still

17   available in the State of Connecticut possibilities of

18   suing pharmaceutical companies for breach of the CPLA,

19   notwithstanding the Second Restatement of Torts.

20           I don't see any express warranty that has been

21   made.  I don't see evidence of an express warranty that's

22   been made to the plaintiff by the defendant, and it's my

23   current intention to grant the summary judgment motion

24   with respect to any express breach of warranty claim.

25           I think there are, and I understand that the

1    fits for particular purpose warranty claims have been

2    withdrawn.  The implied warranty claims, it seems to me,

3    would survive.  I think there are implied warranties that

4    arise from any approved pharmaceutical that it's safe

5    within the limits of disclosed warnings on its product

6    labeling.

7          The CUTPA claim falls to the summary judgment

8    motion because the CPLA provides exclusive remedy for a

9    party seeking compensation for product defects, as is

10   clear from established Connecticut law.

11         And to the extent the motion seeks to rely upon

12   the exclusion of expert testimony, since I've declined to

13   exclude the testimony on which argument relies on that

14   claim, also fails.  That is, that claim or that argument

15   in the summary judgment motion also fails.  Summary

16   judgment will not be granted on that ground.

17         That's what I intend to do with the summary

18   judgment motion.

19         MS. STEVENS:  As Mr. Evans said, I guess I face

20   an uphill battle, yes?

21         THE COURT:  You won some.  Congratulations.

22         MS. STEVENS:  Thank you.  Maybe I should sit

23   down, yes?

24         I'll try to take them in the order Your Honor

25   has laid them out and respond to a few of your comments.

1           THE COURT:  Sure.

2           MS. STEVENS:  First, on the statute of

3   limitations issue, I understand Your Honor's thoughts.  I

4   think it's clear that under the CPLA, claims need to be

5   brought three years from the date of the injury or the

6   discovery of the injury.  No question in this case that

7   plaintiff knew in 1999 at the time of her diagnosis that

8   she had breast cancer, so the question is whether she knew

9   there was an association between a hormone therapy and her

10  breast cancer and whether she had an actual harm.

11          I think Dr. May's testimony -- we believe

12  Dr. May's testimony answers that.  She told her about the

13  risks when she went on the product.  She informed her

14  about her belief that it has an association and she warned

15  Ms. Moss of that.

16          How did Dr. May get that information?  Well, she

17  got that information not just from the warning label but

18  she testified she relied on studies and on textbooks and

19  on CMEs, continuing medical education, ground rounds,

20  conversations with her colleagues.  She had information

21  not just from the warning label but her surroundings in

22  the medical community.

23          The warning label --

24          THE COURT:  Did she communicate that to

25  Mrs. Moss?  She communicated all those studies, all the

1    things she heard in the hallway in the hospital?  They had

2    a long conversation, I guess.

3         MS. STEVENS:  Mrs. Moss apparently was a nurse

4    with Dr. May, and Mrs. Moss was a well educated woman.

5    She worked on the GYN floor.  We don't have any evidence

6    of what she communicated.  Unfortunately Ms. Moss passed

7    away before she was deposed and unfortunately there's no

8    affidavit saying what she was communicated at the time.

9         But what we do have is Dr. May, who testified,

10   "So, would you have made Ms. Moss aware that there was

11   this possible association between taking hormone therapy

12   and the risk of having breast cancer?"  And she said yes.

13   And so that's in 1993 when she goes on the medication.

14        THE COURT:  She would have done it.  It's not

15   even a --

16        MS. STEVENS:  That is correct.  It was her

17   standard practice at the time, is what she said.

18        THE COURT:  Right.

19        MS. STEVENS:  So, Dr. May would have had the

20   information from the warning label that Your Honor

21   discussed.  And the warning label, it starts with

22   "Warning."  It is a warning.  It is a warning of induction

23   of malignant neoplasms.  It is the first warning on the

24   warning, this is from the 1996 Prempro.  And the first

25   sentence is "Some studies have reported a moderately

increased risk of breast cancer.  Relative risk of 1.3 to

2.0 on this estrogen replacement therapy, taking higher

doses or those taking lowers for prolonged periods of

time."

THE COURT:  Okay, but again, the problem, if you

won on the warning claim, you also probably also win on

the statute of limitations claim, you know?  The day she

discovers she has cancer, she goes back and she reads that

warning and says, well, some studies have reported a

moderately increased risk, but basically the majority

don't associate risks with women who have ever used

estrogen replacement therapy, so there's so many

qualifiers here that suggest it doesn't apply to me.

MS. STEVENS:  I understand Your Honor's point.

Two responses.  That, first under Connecticut law and in

the Vitanza case, it's clear that the duty to warn goes to

the doctor, so this is a warning to the physician.  This

is a warning to Dr. May, not to Ms. Moss.  So it's a

warning to her.  So Ms. Moss isn't going to pick up this

warning.  It's a warning to the doctor.

And your warning claim point, the second

sentence takes it away.  Let's look at what Dr. May said

about what she believed the second sentence said.  She was

asked the direct question, "The second sentence says 'The

majority of the studies, however, have not shown an

```
 1    association in women who have ever used estrogen

 2    replacement therapy.'  Do you see that?"

 3              "Yes."

 4              "Does that sentence seem to neutralize or negate

 5    the previous warnings from sentence one?"

 6              She says no.

 7              So this is the doctor where the warning

 8    obligation falls to.  She doesn't believe there's any

 9    neutralization, any negation from the first sentence.

10              THE COURT:  And the jury may well agree with

11    you.

12              MS. STEVENS:  Your Honor, I believe the Goodson

13    case is illustrative.  Goodson was a birth control case,

14    471 FSupp 546, where the doctor testified that she knew

15    about the risk of stroke, not just from reading the label,

16    but from reading journal articles and discussions with

17    colleagues.  And in Goodson the court said, "Even where

18    the warning is found to be inadequate to the medical

19    profession as a whole, it's clear that the physician who

20    prescribed the Mullein (ph)" -- that's the medication --

21              THE COURT:  Had been adequately warned of.

22              MS. STEVENS:  Had been adequately warned.

23              THE COURT:  Adequately warned.  So it begs the

24    question whether that warning is an adequate warning.  If

25    a jury finds that that warning -- that's what I'm saying,
```

1    if the jury finds that warning is adequate, you'll win on

2    statute of limitations grounds.

3           MS. STEVENS:  Your Honor, I submit that Dr. May

4    believed that the warning was adequate because she

5    testified that she didn't think it was negated and the

6    duty goes to warn Dr. May, that she passed that along.

7           THE COURT:  I understand the argument.

8           MS. STEVENS:  One last brief argument I'll

9    raise.  Your Honor raised proximate cause and our points

10   on proximate cause.  It's our position that it's

11   plaintiff's burden to meet the proximate cause and it's

12   plaintiff's burden to show that the plaintiff would have

13   done something different, the prescribing doctor would

14   have done something different.  In this case there's

15   simply a lack of evidence.  We don't have -- Dr. May

16   testified that she would still prescribe today, if a

17   patient like Ms. Moss presented with symptoms, she would

18   still make that decision to prescribe and we have

19   absolutely no evidence from Ms. Moss that anything -- that

20   she wouldn't have taken the drug if the warning had been

21   different.  There's no affidavit, there's no deposition

22   testimony.

23           And in Connecticut, where there is not a heeding

24   presumption, it's plaintiff's burden to prove that the

25   harm would not have been suffered at the end of the day

1    and they simply haven't met that burden.

2         THE COURT:  I guess we just disagree about

3    whether there's sufficient evidence from which a

4    reasonable jury could draw inferences that would be

5    sufficient to satisfy that requirement.

6         MS. STEVENS:  I understand, Your Honor.

7         THE COURT:  Thank you.

8         MS. STEVENS:  Thank you, Your Honor.

9         THE COURT:  Anything further?

10        MR. BUBALO:  Your Honor, just a couple

11   illustrations.  I did tender to you a proposed jury

12   instructions where we give a strict liability instruction

13   based on your Izzarelli instruction, a negligence

14   instruction as well as a failure to warn instruction.

15        Implied warranty, I did not tender that and I'm

16   going to have to look at it but I think maybe the implied

17   warranty is actually incorporated in all that.

18        Couple of issues are outstanding that I think

19   will be helpful for the court in ruling on some of the

20   evidentiary motion in limines coming up.

21        THE COURT:  Let me just clarify, are you wishing

22   to be heard on the summary judgment motion or are you

23   raising another issue?

24        MR. BUBALO:  I think it's related -- it's

25   another issue.  It's another issue.  I mean the summary

1    judgment motion, we agree with you and don't have any

2    issues.

3            THE COURT:  All right.  So that's my ruling on

4    summary judgment essentially for the reasons I've given.

5            So, what is your issue?

6            MR. BUBALO:  Just to illustrate to the court a

7    couple of issues out there.  Number one, and I think it is

8    related to the summary judgment motion to the extent that

9    they are arguing that the learned intermediary doctrine

10   applies in this circumstance.

11           We believe that because the FDA required Wyeth

12   on a estrogen drug to directly warn Mrs. Moss that the

13   learned intermediary doctrine would require not only

14   warning to Mrs. Moss but there's an exception here -- I

15   mean, excuse me, to Mrs. Moss's doctors, that there's an

16   exception here that required a warning to Mrs. Moss.

17   Mrs. Moss got a patient package insert in each blister

18   pack of Prempro, and each time she got that patient

19   package insert, the first three or four lines about breast

20   cancer said "This drug, according to most studies, is not

21   associated with breast cancer."

22           And I'd just like to tender to the court for the

23   court's consideration a Law Review article -- yes, same

24   thing.  That argues in circumstances such as these, if the

25   court's interested -- I don't want to belabor my welcome

1   here, maybe I'm a little bit premature -- but this Law

2   Review article argues that in circumstances of hormone

3   therapy, the learned intermediary doctrine really doesn't

4   apply and a direct warning is required because of the

5   FDA's requirement to directly warn the patient.

6           If you're interested in that, Your Honor, at

7   this point --

8           THE COURT:  I'll read anything you give me,

9   either side gives me.

10          MR. BUBALO:  Thank you, Your Honor.

11          (Hands Court)

12          MR. BUBALO:  The other point is on, and I think

13  this would be helpful to think about, is negligent

14  omissions in marketing.  We have a circumstance here where

15  we know the doctor did not get the Collaborative Study

16  which was out in 1997.  We know that the detailed

17  representatives were instructed by Wyeth not to give that

18  Collaborative Study to physicians.  So we tendered a

19  negligent admission based on the standards of Connecticut,

20  Connecticut instructions, and we think that may be another

21  reason why marketing would be relevant.

22          So I would just give this to the court.  Maybe

23  it's a little bit premature but I'm going to be referring

24  to these tendered instructions.  I think that's a little

25  better way of putting structure on MILs to see what might

1    be relevant and what may not be relevant.

2         THE COURT:  Let me make sure I understand what

3    you're saying.  You believe there is a negligent omission

4    to disclose a study and, as a result of an omission,

5    marketing information about affirmative representations

6    becomes relevant?

7         MR. BUBALO:  Yes, because there's a, there's

8    a -- there's a chance to convey the breast cancer risk in

9    each affirmative misrepresentation -- in each affirmative

10   representation both to the patient and to the doctor, but

11   an omission also, and in that affirmative statement to go

12   on and say, well, here's the balance of the benefits for

13   this.  It's good for your head, heart, whatever, it's for

14   everything but as a motor oil additive, and then totally

15   silent on breast cancer.  Zero comment on breast cancer.

16        Not only is it zero comment on breast cancer in

17   all of this material distributed to Dr. May but the, the

18   detail representatives had articles in their hands that

19   would have been significant to Dr. May and impact her

20   prescribing habits that she didn't know about and they

21   failed to turn over to Dr. May.

22        THE COURT:  Well, that may be, and that's an

23   interesting theory that they had stuff they didn't turn

24   over.  What I fail to see is the connection between an

25   omission theory.  They had this study and they didn't tell

1    her about the study.  I don't see a connection between

2    that theory and so now, since they didn't tell her about

3    the study, we get to put in all the things they did say

4    that she has testified she didn't really review or care

5    about or look at.

6              MR. BUBALO:  Well, I think also, Your Honor --

7              MR. EVANS:  Your Honor, I guess I just have an

8    objection.  I don't know what we're addressing at this

9    point.  We're going to have another hearing on motions in

10   limine.  All these issues will come up.  I'm not sure why

11   we are trying to frame issues and preview arguments when

12   they're not in front of you and we're not here for that

13   purpose today.

14             MR. BUBALO:  Well, I concede that --

15             MR. EVANS:  All that, plus I have a plane to

16   catch, so --

17             THE COURT:  It's only been three hours.

18             MR. EVANS:  I was told by local counsel, Your

19   Honor, that you've never had a hearing more than two

20   hours.  So --

21             THE COURT:  Well, I'm not sure that's accurate.

22   But seems like I have.  This is on the longer side.

23             MR. BUBALO:  Yes, and we're going to have plenty

24   of time to argue all these issues.  I think the strict

25   liability issue and what consumer expectations are also

1    makes relevant the marketing issues as well.  So -- we'll

2    argue all those issues.

3                THE COURT:  Okay.  That's sounds good.

4                Anything else we can usefully do today?

5                MS. ROBERTS:  I don't think so.

6                THE COURT:  All right.  Thank you all for coming

7    in.

8                (Whereupon the above matter was adjourned at 1:00

9    o'clock, p. m.)

C E R T I F I C A T E

I, Susan E. Catucci, RMR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.

/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761